## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UMG RECORDINGS, INC., CAPITOL
RECORDS, LLC, ASYLUM RECORDS LLC,
ATLANTIC RECORDING CORPORATION,
ATLANTIC RECORDS GROUP LLC, BAD BOY
RECORDS LLC, BIG BEAT RECORDS INC.,
ELEKTRA ENTERTAINMENT GROUP INC.,
ELEKTRA ENTERTAINMENT LLC, FUELED
BY RAMEN LLC, LAVA RECORDS LLC,
MAVERICK RECORDING COMPANY,
NONESUCH RECORDS INC., RHINO
ENTERTAINMENT COMPANY, RHINO
ENTERTAINMENT LLC, ROADRUNNER
RECORDS, INC., RYKODISC, INC., WARNER
MUSIC INC., WARNER MUSIC
INTERNATIONAL SERVICES LIMITED,
WARNER MUSIC LATINA INC., WARNER
MUSIC NASHVILLE LLC, WARNER
RECORDS INC., WARNER RECORDS LLC,
WARNER RECORDS/QRI VENTURE, INC.,
WARNER RECORDS/SIRE VENTURES LLC,
ARISTA MUSIC, ARISTA RECORDS, LLC,
LAFACE RECORDS, LLC, SONY MUSIC
ENTERTAINMENT, SONY MUSIC
ENTERTAINMENT US LATIN LLC, ULTRA
RECORDS, LLC, VOLCANO
ENTERTAINMENT III, LLC, ZOMBA
RECORDING LLC, AND ABKCO MUSIC &
RECORDS, INC.,

     Plaintiffs,

v.

VERIZON COMMUNICATIONS INC.,
VERIZON SERVICES CORP., AND CELLCO
PARTNERSHIP (D/B/A VERIZON WIRELESS)

     Defendants.

Civ. Case No.  24-cv-5285

**COMPLAINT**

TRIAL BY JURY DEMANDED

# PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs UMG Recordings, Inc. and Capitol Records, LLC (collectively, "UMG" or the "Universal Plaintiffs"); Plaintiffs Asylum Records LLC, Atlantic Recording Corporation, Atlantic Records Group LLC, Bad Boy Records LLC, Big Beat Records Inc., Elektra Entertainment Group Inc., Elektra Entertainment LLC, Fueled by Ramen LLC, Lava Records LLC, Maverick Recording Company, Nonesuch Records Inc., Rhino Entertainment Company, Rhino Entertainment LLC, Roadrunner Records, Inc., Rykodisc, Inc., Warner Music Inc., Warner Music International Services Limited, Warner Music Latina Inc., Warner Music Nashville LLC, Warner Records Inc., Warner Records LLC, Warner Records/QRI Venture, Inc., and Warner Records/SIRE Ventures LLC (collectively, "WMG" or the "Warner Plaintiffs"); Plaintiffs Arista Music, Arista Records, LLC, LaFace Records, LLC, Sony Music Entertainment, Sony Music Entertainment US Latin LLC, Ultra Records, LLC, Volcano Entertainment III, LLC, and Zomba Recording LLC (collectively, "SME" or the "Sony Plaintiffs"); and ABKCO Music & Records, Inc. ("ABKCO," and together with the Universal Plaintiffs, the Warner Plaintiffs, and the Sony Plaintiffs, the "Record Companies" or "Plaintiffs"), by and through their attorneys Oppenheim + Zebrak, LLP, for their Complaint against defendants Verizon Communications Inc., Verizon Services Corp., and Cellco Partnership (d/b/a Verizon Wireless) (collectively, "Verizon" or "Defendants"), allege, on personal knowledge as to matters relating to themselves and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.	Verizon is one of the largest Internet Service Providers ("ISPs") in the country and knowingly provides its high-speed service to a massive community of online pirates, who it knows repeatedly use that service to infringe Plaintiffs' copyrights. Over the past few years alone,

2

Plaintiffs sent Verizon *hundreds of thousands* of copyright infringement notices. Those notices identify specific subscribers on Verizon's network stealing Plaintiffs' sound recordings through peer-to-peer ("P2P") file-sharing networks that are notorious hotbeds for copyright infringement. While Verizon is famous for its "Can you hear me now?" advertising campaign, it has intentionally chosen not to listen to complaints from copyright owners. Instead of taking action in response to those infringement notices as the law requires, Verizon ignored Plaintiffs' notices and buried its head in the sand. Undeterred, infringing subscribers identified in Plaintiffs' notices continued to use Verizon's services to infringe Plaintiffs' copyrights with impunity. Meanwhile, Verizon continued to provide its high-speed service to thousands of known repeat infringers so it could continue to collect millions of dollars from them.

2. Plaintiffs bring this action against Verizon for contributory and vicarious copyright infringement. Verizon has knowingly contributed to, and reaped substantial profits from, massive copyright infringement committed by tens of thousands of its subscribers. By ignoring Plaintiffs' notices and its own legal obligations, Verizon facilitated its subscribers' infringement of Plaintiffs' copyrights through the continued provision of its high-speed Internet service to known repeat infringers.

3. Plaintiffs are record companies or recorded music businesses that produce, manufacture, distribute, sell, and license commercial sound recordings both in the United States and internationally. Through their enormous investments of money, time, and exceptional creative efforts, Plaintiffs and the recording artists they represent have developed and/or distributed some of the world's most famous music. Their investments and creative efforts have shaped the musical landscape as we know it, both in the United States and around the world. As a result, Plaintiffs own and/or control exclusive rights to many of the most popular sound recordings performed by

classic artists and contemporary superstars, including The Rolling Stones, Ariana Grande, Bob Dylan, Bruno Mars, Elvis Presley, Dua Lipa, Drake, and many more.

4.       Verizon markets and sells high-speed Internet services to consumers nationwide. Through the provision of those services, Verizon contributed to and profited from pervasive copyright infringement by its subscribers on P2P file-sharing networks.  Verizon's contribution to its subscribers' infringement is both willful and extensive, and it renders Verizon equally liable for that infringement.  Indeed, for years, Verizon deliberately refused to take action to prevent its customers from using its Internet services to infringe others' copyrights, including Plaintiffs' copyrights—even after Verizon was put on notice of particular customers engaging in specific, repeated acts of infringement.

5.       Since early 2020, Plaintiffs' representatives have sent more than 340,000 infringement notices to Verizon.  Those notices clearly and unambiguously advised Verizon of its subscribers' blatant and systematic use of Verizon's Internet service to illegally download, copy, and distribute Plaintiffs' copyrighted sound recordings through the P2P network known as BitTorrent.

6.       The scope of repeat infringement on Verizon's network is staggering.  Thousands of Verizon subscribers were the subject of 20 or more notices from Plaintiffs, and more than 500 subscribers were the subject of 100 or more notices.  One particularly egregious Verizon subscriber was single-handedly the subject of *4,450 infringement notices* from Plaintiffs alone.

7.       Verizon acknowledged that it received these notices of infringement sent by Plaintiffs' representatives.  Yet rather than taking any steps to address its customers' illegal use of its network, Verizon deliberately chose to ignore Plaintiffs' notices, willfully blinding itself to that information and prioritizing its own profits over its legal obligations.

8. It is well-established law that if a party materially assists someone it knows is engaging in copyright infringement, that party is fully liable for the infringement as if it had infringed directly. Further, when a party has a direct financial interest in the infringing activity, and the right and practical ability to stop or limit it, that party also faces liability. Flouting those basic responsibilities, Verizon deliberately turned a blind eye to its subscribers' infringement. Verizon failed to terminate or otherwise take any meaningful action against the accounts of repeat infringers of which it was aware. Instead, Verizon routinely thumbed its nose at Plaintiffs by continuing to provide its service to subscribers it knew to be serially infringing Plaintiffs' copyrighted sound recordings. In reality, Verizon operated its service as an attractive tool and safe haven for infringement.

9. Verizon has derived an obvious and direct financial benefit from its subscribers' infringement. The unlimited ability to download and distribute Plaintiffs' copyrighted works through Verizon's service has served as a draw for Verizon to attract, retain, and charge higher fees to infringing subscribers. By failing to terminate the accounts of specific recidivist infringers known to Verizon, Verizon obtained a direct financial benefit from those subscribers' continuing infringing activity. That financial benefit included improper revenue that Verizon would not have received had it appropriately shut down those accounts as well as the costs that Verizon saved by failing to implement an effective repeat infringer program. In other words, Verizon decided not to terminate repeat infringers because it wanted to maintain the revenue generated from those subscribers' accounts.

10. To be clear, the infringing activity of Verizon's subscribers that is the subject of Plaintiffs' claims, and for which Verizon is secondarily liable, all occurred *after* Verizon received multiple notices of each subscriber's infringing activity. Plaintiffs seek damages for infringement

of their sound recordings by Verizon subscribers after those particular subscribers were identified to Verizon in multiple infringement notices.

## JURISDICTION AND VENUE

11.    This is a civil action in which Plaintiffs seek damages for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*, and the Music Modernization Act, 17 U.S.C. § 1401.

12.    This Court has original subject matter jurisdiction over Plaintiffs' copyright infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13.    This Court has personal jurisdiction over Verizon pursuant to New York Civil Practice Law and Rule ("CPLR") 301.  Verizon's official headquarters and Board of Directors are located in New York, it has consented to jurisdiction in the state in a tolling agreement entered into between the parties, and it has pervasive corporate ties to the state that are sufficient to justify the imposition of general jurisdiction here.

14.    This Court also has personal jurisdiction over Verizon pursuant to CPLR 302. Verizon transacts business within New York to supply Internet service to customers in this state. In addition, Verizon has deliberately exploited the New York market, establishing network operations in this district, selling its services to New York residents, and advertising its Internet service to potential subscribers in the state.  Verizon has committed tortious acts within New York, including providing Internet service to New York subscribers who used Verizon's network to directly and repeatedly infringe Plaintiffs' copyrights; continuing to provide Internet service to, and failing to suspend or terminate the accounts of, New York customers, even after receiving multiple notices of their infringing activity; advertising its high-speed Internet service in New York to serve as a draw for subscribers who sought faster download speeds to facilitate their direct and

repeated infringements; and/or responding or failing to respond to repeated notices of copyright infringement directed to infringing subscribers located in the state. Verizon also has caused injury to Plaintiffs in this state by allowing its customers to use Verizon's network to systematically infringe Plaintiffs' copyrights, all while deriving billions of dollars in revenue (including over $130 billion in 2023 alone)[1] from interstate commerce.

15. Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400.

## PLAINTIFFS AND THEIR COPYRIGHTED SOUND RECORDINGS

16. Plaintiffs are the copyright owners of, and/or control exclusive rights with respect to, millions of sound recordings, including many recorded by some of the most prolific and well-known recording artists throughout the world.

17. Plaintiff UMG Recordings, Inc. is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

18. Plaintiff Capitol Records, LLC is a Delaware limited liability company with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404.

19. Plaintiff ABKCO Music & Records, Inc. is a New York corporation with its principal place of business at 85 Fifth Avenue, New York, New York 10003.

20. Plaintiff Asylum Records LLC is a Delaware limited liability company with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California 90021.

21. Plaintiff Atlantic Recording Corporation is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

---

[1] Verizon Communications Inc., Form 10-K (Feb. 9, 2024), *available at* https://quotes.quotemedia.com/data/downloadFiling?webmasterId=104600&ref=318048243&type=HTML&formType=424B2&formDescription=Prospectus+%5BRule+424%28b%29%282%29%5D&dateFiled=2024-06-17&cik=0000732712.

22.     Plaintiff Atlantic Records Group LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York 10019.

23.     Plaintiff Bad Boy Records LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York 10019.

24.     Plaintiff Big Beat Records Inc. is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

25.     Plaintiff Elektra Entertainment Group Inc. is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

26.     Plaintiff Elektra Entertainment LLC is a Delaware limited liability company with its principal place of business 1633 Broadway, New York, New York 10019.

27.     Plaintiff Fueled by Ramen LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York 10019.

28.     Plaintiff Lava Records LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York 10019.

29.     Plaintiff Maverick Recording Company is a California general partnership with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California 90021.

30.     Plaintiff Nonesuch Records Inc. is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

31.     Plaintiff Rhino Entertainment Company is a Delaware corporation with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California 90021.

32.     Plaintiff Rhino Entertainment LLC is a Delaware limited liability company with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California 90021.

33. Plaintiff Roadrunner Records, Inc. is a New York corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

34. Plaintiff Rykodisc, Inc. is a Minnesota corporation with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California 90021.

35. Plaintiff Warner Music Inc. is a Delaware corporation with its principal place of business at 1633 Broadway, New York, New York 10019.

36. Plaintiff Warner Music International Services Limited is a limited liability company, organized and existing under the laws of England and Wales, with its principal place of business at 27 Wrights Lane, London, England.

37. Plaintiff Warner Music Latina Inc. is a Delaware corporation with its principal place of business at 555 Washington Avenue, Miami Beach, Florida 33139.

38. Plaintiff Warner Music Nashville LLC is a Tennessee limited liability company with its principal place of business at 20 Music Square East, Nashville, Tennessee 37203.

39. Plaintiff Warner Records Inc. is a Delaware corporation with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California 90021.

40. Plaintiff Warner Records LLC is a Delaware limited liability company with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California 90021.

41. Plaintiff Warner Records/QRI Venture, Inc. is a Delaware corporation with its principal place of business at 777 S. Santa Fe Avenue, Los Angeles, California 90021.

42. Plaintiff Warner Records/SIRE Ventures LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York 10019.

43. Plaintiff Arista Music is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.

44.     Plaintiff Arista Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

45.     Plaintiff LaFace Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

46.     Plaintiff Sony Music Entertainment is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  Sony Music Entertainment's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.

47.     Plaintiff Sony Music Entertainment US Latin LLC is a Delaware limited liability company with its principal place of business at 3390 Mary Street, Suite 220, Coconut Grove, Florida 33133.

48.     Plaintiff Ultra Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

49.     Plaintiff Volcano Entertainment III, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

50.     Plaintiff Zomba Recording LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.

51.     Plaintiffs own and/or control in whole or in part the copyrights and/or exclusive U.S. rights in innumerable popular sound recordings, including at the time of the infringements at issue here, and including the sound recordings listed on Exhibit A, which are illustrative and non-exhaustive.  All of the sound recordings listed on Exhibit A have been registered with the U.S. Copyright Office or, for sound recordings fixed before February 15, 1972, identified on schedules filed with the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

## **VERIZON AND ITS ACTIVITIES**

52.    Defendant Verizon Communications Inc. is a Delaware corporation that is headquartered at 1095 Avenue of the Americas, New York, New York 10036.

53.    Defendant Verizon Services Corp. is a Delaware corporation that is headquartered at 1095 Avenue of the Americas, New York, New York 10036.

54.    Defendant Cellco Partnership (d/b/a Verizon Wireless) is a Delaware corporation that is headquartered at 1095 Avenue of the Americas, New York, New York 10036.

55.    Verizon Communications Inc. is one of the leading providers of technology and communications services in the United States and in the world.  Through its subsidiaries, including Verizon Services Corp. and Cellco Partnership (d/b/a Verizon Wireless), Verizon Communications Inc. provides wireless and wireline data and Internet services to millions of residential and business subscribers around the country.

56.    As of December 2023, Verizon's consumer group, which focuses primarily on residential subscribers, provided 115 million wireless retail connections, 9 million broadband connections, and 3 million video connections.  Verizon also provided business customers with approximately 30 million wireless retail connections and approximately 2 million total broadband connections.

57.    At all pertinent times, Verizon's customers have paid substantial subscription fees for access to Verizon's high-speed Internet service, with Verizon offering a tiered pricing structure whereby a subscriber can purchase faster downloading speeds for a higher monthly fee.

58.    Many of Verizon's customers are motivated to subscribe to Verizon's service because it allows them to download music and other copyrighted content—including unauthorized content—as fast as possible.  Accordingly, in its consumer marketing materials, Verizon touts the

speed at which its customers can download content. For example, Verizon has stated, "You can download an HD movie before the popcorn is ready with speeds nearing a gigabit, just to give you an idea how fast that is."[2] In the same consumer marketing material, Verizon also states that it is "one of the only internet service providers to offer nearly matching download and upload speeds on most plans, which is a major advantage when you're . . . sharing large files."[3]

59.     Verizon has consistently and actively engaged in sophisticated network and customer management practices to suit its own purposes. This includes monitoring for, and taking action against, spam and other unwanted activity that might otherwise interfere with its provision of Internet service to its subscribers. At the same time, Verizon has gone out of its way not to take action against subscribers engaging in repeated copyright infringement, at the expense of copyright owners, ultimately forcing Plaintiffs to bring this action.

60.     Verizon's failure to take action against subscribers using its network to engage in repeated copyright infringement is contrary to its own policies. Indeed, Verizon's "Copyright Infringement/Repeat Infringer Policy" prohibits subscribers from using "Verizon's systems or servers in any manner that constitutes an infringement of third party intellectual property rights, under US copyright law," and further states that, "[p]ursuant to Section 512 of the Digital Millennium Copyright Act (DMCA), it is Verizon's policy to terminate the account of repeat copyright infringers in appropriate circumstances."[4] Verizon's "Acceptable Use Policy" ("AUP") reiterates that subscribers may not use Verizon's network to infringe the intellectual property rights

---

[2] Verizon Fios Home Internet webpage with FAQs, *available at* https://www.verizon.com/home/internet/fios-fastest-internet/ (last accessed July 8, 2024).

[3] *Id.*

[4] Verizon Customer Agreement, *available at* https://www.verizon.com/about/terms-conditions/verizon-customer-agreement (last accessed June 19, 2024).

of others, including copyright. The AUP refers to violations of "any third party's copyright" as an example of conduct "which may lead to termination of [a subscriber's] Service."[5]

61. While publicly stating that its customers may not use its network to infringe, Verizon privately takes active steps to thwart copyright owners from informing Verizon about P2P infringements by its customers. Verizon purports to accept infringement notices through two avenues, but in reality, both are illusory and ineffective.

62. Through one channel, Verizon claims to allow copyright holders to send P2P notices through a so-called "Anti-Piracy Cooperation Program," but it has attached such onerous conditions to participation that the program is rendered a nullity. Not only has Verizon required participants to pay burdensome fees for simple, automated processes like Internet Protocol ("IP") address lookups and notice forwarding, but participants have been required to waive their copyright claims, broadly indemnify Verizon, and, tellingly, keep the terms of the program confidential. Verizon has also limited the number of notices it will forward pursuant to the program.

63. For copyright owners unwilling to waive their rights and "pay-to-play," Verizon directs them to send email notices concerning P2P infringement to CONDUITFORMNOTICES@verizon.com. Verizon publicly states that it "do[es] not review, process, or otherwise take action on [P2P] notices . . . sent via email to any other Verizon email inbox."[6] And yet Verizon plainly does not even review, process or otherwise take action on notices sent by email to CONDUITFORMNOTICES@verizon.com. Verizon does not forward these

---

[5] *Id.*

[6] Copyright Infringement Claims and the Digital Millennium Copyright Act (DMCA), *available at* https://www.verizon.com/support/residential/account/manage-account/security/copyright-infringement-claims (last accessed June 20, 2024).

notices to subscribers or track the number of email notices sent regarding repeat infringing subscribers. Verizon also arbitrarily caps the number of notices permitted per copyright holder at this address—ironic, to say the least, given that Verizon ignored hundreds of thousands of Plaintiffs' notices to this email inbox.

64.     At all pertinent times, Verizon knew that its subscribers routinely used its networks for illegally downloading and uploading copyrighted works, especially sound recordings. As described below, Plaintiffs repeatedly notified Verizon that thousands of its subscribers were actively utilizing its service to infringe Plaintiffs' copyrighted works. Those notices gave Verizon the specific identities of its subscribers engaged in copyright infringement, referred to by their unique IP addresses. Verizon also received millions of notices from other copyright owners, some of which undoubtedly addressed the same subscribers as Plaintiffs' notices. Verizon thus knew which particular subscribers engaged in repeat infringement and Verizon had the right and ability to stop that infringement, including by suspending or terminating the accounts of repeat infringers. Yet Verizon condoned its subscribers' illegal activity because it profited from that activity and its permissive stance toward that activity acted as a draw to attract and retain new and existing subscribers. Verizon's customers, in turn, continued using Verizon's services to infringe Plaintiffs' copyrighted works.

65.     Verizon undoubtedly recognized that if it terminated or otherwise prevented its repeat infringer subscribers from using its service to infringe, or made it less attractive for such use, Verizon would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Verizon provided the means for them to do so in exchange for higher subscription fees. Indeed, Verizon offered "tiered" service plans in which subscribers could pay less for a

lower-tier plan with limits on upload and download speeds and the amount of data available monthly, or alternatively, subscribers could pay more for a higher-tier plan with unlimited data and faster upload and download speeds. In other words, the greater the bandwidth or speed its subscribers required for illegally downloading and uploading copyrighted works, the more money Verizon made.

## THE GLOBAL PEER-TO-PEER PIRACY PROBLEM

66. While the digital age has brought many benefits, it has also facilitated the unprecedented online piracy of copyrighted works. Indeed, federal courts have recognized the "detrimental effect of file-sharing" through P2P networks and the "staggering" level of copyright infringement on the Internet. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 124 (2d Cir. 2010) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005)).

67. Use of P2P distribution systems is the dominant method of engaging in the unauthorized downloading and distribution of copyrighted music over the Internet. P2P is a generic term used to refer to a decentralized network of users whereby each Internet-connected participant (*i.e.*, a "peer" or a "node") can act as both a supplier and consumer of content files. Early P2P services, such as Napster and KaZaA, have been replaced by even more robust and efficient systems, most notably a protocol called "BitTorrent." The online piracy committed via BitTorrent is stunning in nature, speed, and scope. Utilizing a BitTorrent client—essentially a tool that manages the uploading and downloading of files through BitTorrent technology—persons connected to the Internet can locate, access, and download copyrighted content from other peers in the blink of an eye. They download copyrighted music from other network users, usually total strangers, and end up with complete digital copies of any music they desire—without payment to copyright owners or creators.

68.    BitTorrent is uniquely efficient in the way it facilitates illegal file transfers.  On earlier P2P networks, a user wanting to download a music file would have to locate another Internet-connected peer with the desired file and download the entire file from that peer. BitTorrent facilitates much faster downloading by breaking each file into pieces, allowing users to download different pieces of content simultaneously from different peers.  It works on a "tit-for-tat" system, through which users must upload (*i.e.*, distribute) files in order to download files. Thus, the BitTorrent system's design ensures that users begin disseminating content the instant they start downloading it.  This means that, at any given time, each user connected to the Internet can be both downloading and uploading different pieces of a file from, and to, multiple other users. Once a user has downloaded all of the file pieces, the file is automatically reassembled into its complete form.

69.    BitTorrent has been and continues to be used widely as a vehicle to infringe copyrighted music online, including during the period of infringements at issue here.  As of August 2020, BitTorrent and uTorrent (another popular torrent client) had been downloaded and installed over 2 billion times.[7]   The network intelligence company Sandvine reported that in 2021, BitTorrent accounted for nearly 10% of the total upstream volume of Internet traffic and nearly 3% of all Internet traffic globally.[8]  The continuing, extensive use of BitTorrent to infringe sound recordings is borne out by the nearly 350,000 infringement notices Plaintiffs sent to Verizon.

---

[7] BitTorrent Inc. Blog, "BitTorrent Crosses Historic 2 Billion Installations" (Aug. 11, 2020), *available at* https://www.bittorrent.com/blog/2020/08/11/bittorrent-crosses-historic-2-billion-installations (last accessed June 19, 2024).

[8] Sandvine, "Phenomena: The Global Internet Phenomena Report" (Jan. 2022), *available at* https://www.sandvine.com/global-internet-phenomena-report-2022 (last accessed June 19, 2024).

70.     Internet access is essential for P2P file-sharing, including via BitTorrent.  In other words, to download or upload files via BitTorrent, a person must have an Internet connection.  Faster download and upload speeds enable faster and more efficient copying and distribution of files over BitTorrent and other P2P protocols.  Repeat infringers—including Verizon subscribers whom Plaintiffs and other rightsholders observed using BitTorrent to unlawfully copy and distribute copyrighted works—are drawn to Verizon's high-speed Internet service because they can infringe copyright-protected music efficiently, extensively, and repeatedly, without consequence.  Because BitTorrent operates anonymously, it is impossible for copyright holders to address P2P infringement on their own.  The only user-identifying information available to rightsholders monitoring P2P activity is a user's IP address, and thus effective monitoring requires ISP participation to match IP addresses to specific subscribers.

## VERIZON'S PROVISION OF ITS INTERNET SERVICE
## TO KNOWN, REPEAT INFRINGERS

71.     Over the past 25 years, as P2P piracy became widespread, copyright owners have employed many means in an attempt to curtail the massive theft of their works, including sending copyright infringement notices to ISPs.  Verizon has been keenly aware of those efforts, including many very public lawsuits against other ISPs concerning music piracy through BitTorrent, as well as the use of its own network for P2P piracy.

72.     Copyright owners bear the burden—financially and logistically—of monitoring the Internet to identify infringement of their works and notifying ISPs when they identify such infringement on an ISP's network.  If ISPs want the benefit of a statutory safe harbor from monetary damages under Section 512(a) of the Digital Millennium Copyright Act, 17 U.S.C. § 512(a) ("DMCA" or "Section 512"), they must, among other things, adopt and reasonably

17

implement a policy providing for termination, in appropriate circumstances, of subscribers who are repeat infringers. *See* 17 U.S.C. § 512(i).

73.     Section 512 represents a "grand bargain" devised by Congress to encourage the development and proliferation of the Internet, while also respecting the intellectual property rights of copyright owners. Congress intended Section 512 to encourage "service providers and copyright owners to cooperate to detect and deal with copyright infringements" online.[9] In enacting the DMCA, Congress determined that this approach—which expressly contemplates termination of Internet service for repeat infringers—struck the appropriate balance between the need to foster the development of the Internet and promote electronic commerce, and the need to protect the intellectual property of copyright owners.

74.     Upholding their end of the bargain that Congress struck with the DMCA, Plaintiffs have been sending notices of copyright infringement to Verizon for years, identifying specific instances of subscribers' infringement through P2P activities. To ensure that Verizon received those notices so it could identify the infringing subscribers and take appropriate action against them, Plaintiffs sent their notices to both the email address that Verizon specifically provides for P2P notices (CONDUITFORMNOTICES@verizon.com) and to Verizon's DMCA Designated Agent email address. Since February 2020, Plaintiffs alone have sent Verizon over 340,000 notices, detailing specific instances of specific Verizon subscribers using P2P protocols on the Verizon network to download and distribute Plaintiffs' copyrighted works.

75.     Plaintiffs' trade association, the Recording Industry Association of America ("RIAA") engaged a vendor, OpSec Online LLC (formerly known as MarkMonitor, Inc.) ("OpSec"), to detect infringements of Plaintiffs' copyrighted works on Verizon's network and

---

[9] H.R. Rep. 105-551 at 49; S. Rep. 105-190 at 20.

send infringement notices to Verizon. OpSec is a global leader in brand and content protection, representing clients across a huge range of industries, as well as government agencies and law enforcement. Using proprietary technology, OpSec's system connected with Verizon subscribers using P2P software and confirmed, in each instance: (1) that the subscriber was online; (2) that the subscriber was running a file sharing program using the BitTorrent protocol; (3) that the subscriber possessed a confirmed infringing file, identified by a unique "hash" value; and (4) that the subscriber was in fact distributing the confirmed infringing file, identified by a unique "hash" value, on Verizon's network. OpSec also verified the file hashes to confirm that Plaintiffs' copyrighted works were being distributed. Once OpSec had collected this evidence of infringement, OpSec generated and sent a notice of infringement to Verizon.

76. Each infringement notice OpSec sent to Verizon on Plaintiffs' behalf identified the unique IP address assigned to each subscriber to Verizon's network and the date and time the infringing activity was detected. Only Verizon, as the provider of the technology and system used to infringe, was in possession of the information required to match the IP address to a particular subscriber, and to contact that subscriber or take other appropriate action. While Plaintiffs undertook the burden and responsibility of monitoring Verizon's network for infringement of Plaintiffs' copyrighted works, only Verizon could take action against its subscribers for violating Verizon's own Copyright Infringement/Repeat Infringer Policy and AUP by infringing Plaintiffs' copyrights.

77. Plaintiffs' infringement notices provided Verizon with knowledge of clear and unambiguous infringing activity by Verizon subscribers—that is, unauthorized downloading and distribution of Plaintiffs' copyrighted works. Verizon's subscribers had no legal basis or

justification for downloading or distributing digital copies of Plaintiffs' sound recordings to thousands or millions of strangers over the Internet.

78.     Apart from attesting to the sheer volume of the infringing activity on its network, the infringement notices sent to Verizon identified specific subscribers who were flagrant and serial infringers. The infringement notices identified thousands of Verizon subscribers engaged in blatant and repeated infringement of Plaintiffs' copyrighted works, including over 500 subscribers that were the subject of more than 100 infringement notices. The level of recidivism across repeat infringers on Verizon's network during the period of infringement at issue here is staggering. To cite just a few specific examples:

- From March 2021 to at least August 2023, a Verizon subscriber with the IP address 100.37.98.18 was identified in **4,450** infringement notices, sent on at least 659 separate days.

- From August 2020 to at least December 2021, a Verizon subscriber with the IP address 68.134.246.125 was identified in **2,703** infringement notices, sent on at least 441 separate days.

- From March 2021 to at least August 2023, a Verizon subscriber with the IP address 173.70.227.147 was identified in **2,068** infringement notices, sent on at least 251 separate days.

These examples and many others amply illustrate that, rather than taking steps to meaningfully curb infringement, Verizon simply turned a blind eye to the massive infringement on its network.

79.     During all pertinent times, Verizon had the full legal right, obligation, and technical ability to prevent or limit the infringements occurring on its network. Under Verizon's AUP and its Copyright Infringement/Repeat Infringer Policy, which its subscribers agreed to as a condition of using Verizon's Internet service, Verizon was empowered to exercise its right and ability to suspend or terminate a subscriber's Internet access. Verizon could do so for a variety of reasons, including a subscriber's copyright infringements. Verizon undoubtedly terminated numerous subscribers for non-payment of their monthly fees for Internet and other services.

80. Ignoring its policies, and receiving over 340,000 infringement notices from Plaintiffs, as well as millions of similar notices from other copyright owners, Verizon knowingly permitted specifically identified repeat infringers to continue to use its network to infringe. Rather than disconnect the Internet access of blatant repeat infringers or take other steps to curtail their infringement, Verizon knowingly continued to provide these subscribers with the Internet access that enabled them to continue to illegally download and/or distribute Plaintiffs' copyrighted works unabated. Verizon's provision of high-speed Internet service to known, repeat infringers materially contributed to these direct infringements.

81. Verizon's motivation for refusing to terminate or suspend the accounts of blatant infringing subscribers is simple: Verizon valued corporate profits over its legal responsibilities. Verizon is paid monthly fees directly by repeat infringing subscribers. Verizon is paid more when subscribers need higher data speeds or plans, which repeat infringers often do given the amount of data required for using BitTorrent and other P2P protocols. Verizon did not want to lose subscriber revenue by terminating accounts of infringing subscribers. Retaining infringing subscribers provided a direct financial benefit to Verizon. Nor did Verizon want to risk the possibility that account terminations would make its service less attractive to other existing or prospective customers. Moreover, Verizon was simply disinterested in devoting sufficient resources to tracking repeat infringers, responding to infringement notices, and terminating accounts in appropriate circumstances. Considering only its pecuniary gain, Verizon ignored and turned a blind eye to flagrant, repeated violations by known specific subscribers using its service to infringe, thus facilitating and multiplying the harm to Plaintiffs.

82. Verizon's failure to take meaningful action against its infringing subscribers drew subscribers engaging in Internet piracy to purchase Verizon's services, so that those subscribers

could infringe Plaintiffs' (and others') copyrights and avoid obtaining that copyrighted content through legitimate channels. Infringing subscribers were drawn to Verizon's services both because of its lax policies concerning copyright infringement and faster internet speeds that facilitated the use of P2P protocols for those willing to pay more. Verizon fostered a safe haven for infringement in light of its lax policies and thus encouraged its subscribers to infringe. The specific infringing subscribers identified in Plaintiffs' notices, including the particularly egregious infringers identified above, knew that Verizon would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Verizon subscribers so that they could continue illegally downloading copyrighted works.

83. In short, Verizon provided high-speed Internet service to repeat infringers known to Verizon to have repeatedly used its network to infringe Plaintiffs' copyrights in blatant disregard of Verizon's legal obligations and its own public-facing end-user policies. Once Verizon received Plaintiffs' (and other rightsholders') infringement notices regarding a subscriber with a particular IP address, Verizon *knew* that its network was being used for unlawful purposes, and it had a responsibility to act, both in accordance with federal law and its own policies. If Verizon had suspended or terminated the service of known repeat infringers identified by Plaintiffs, Verizon could have prevented further infringement. Indeed, Congress intended that the DMCA require ISPs to alert their subscribers that, for "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others[,] . . . there is a realistic threat of losing that access."[10] Verizon chose instead to contribute to, facilitate, and profit from the repeated infringements of its subscribers.

---

[10] S. Rep. 105-190 at 52; H.R. Rep. 105-551 at 61.

84.     The consequences of Verizon's support of and profit from infringement are obvious and stark.  When Verizon's subscribers use Verizon's network to obtain infringing copies of Plaintiffs' copyrighted works illegally, that activity undercuts the legitimate music market, depriving Plaintiffs and those recording artists and songwriters whose works they sell and license of the compensation to which they are entitled.

## CLAIMS FOR RELIEF

### Count I – Contributory Infringement

85.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

86.     Plaintiffs own or exercise exclusive control in the U.S. over rights in the sound recordings listed in Exhibit A, which represent an illustrative and non-exhaustive list of Plaintiffs' works infringed by Verizon's subscribers.  All of the sound recordings listed on Exhibit A have been duly registered with the U.S. Copyright Office or, for sound recordings fixed before February 15, 1972, submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

87.     Verizon's subscribers, using Internet access and services provided by Verizon, have unlawfully and without authorization reproduced and distributed via BitTorrent thousands of Plaintiffs' sound recordings, including those listed on Exhibit A and many others.

88.     The foregoing activity by Verizon's subscribers constitutes direct infringement in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq.* and the Music Modernization Act, 17 U.S.C. § 1401.

89.     Verizon is liable as a contributory infringer for the direct infringements described above.

90. Through Plaintiffs' infringement notices and other means, Verizon had knowledge that its network was being used to infringe Plaintiffs' works on a massive scale, and also knew of specific subscribers engaged in such repeated and flagrant infringement of specific works.

91. Verizon nevertheless facilitated, encouraged, and materially contributed to such infringement by continuing to provide its services, network, and the facilities necessary for its subscribers to commit repeated infringements. Verizon had the means to withhold that assistance upon learning of specific infringing activity by specific users but failed to do so.

92. By purposefully ignoring and turning a blind eye to its subscribers' flagrant and repeated infringements, Verizon knowingly caused and materially contributed to the unlawful reproduction and distribution of Plaintiffs' works, including but not limited to those listed on Exhibit A, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

93. Each infringement of Plaintiffs' sound recordings constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Verizon are timely because they all fall within the Copyright Act's statute of limitations set forth at 17 U.S.C. § 507, as extended by a tolling agreement between the parties.

94. The foregoing acts of infringement by Verizon have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights. Indeed, the sound recordings listed on Exhibit A represent a non-exhaustive list of works infringed by Verizon's subscribers *after* those particular subscribers were identified to Verizon in multiple infringement notices.

95. As a direct and proximate result of Verizon's willful infringement of Plaintiffs' copyrights and other exclusive rights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed.

Alternatively, at Plaintiffs' election, Plaintiffs shall be entitled to their actual damages pursuant to 17 U.S.C. § 504(b), including Verizon's profits from the infringements, as will be proven at trial.

96.     Plaintiffs are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## Count II – Vicarious Infringement

97.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 84 as if fully set forth herein.

98.     Plaintiffs own or exercise exclusive control over rights in the sound recordings listed in Exhibit A, which represent an illustrative and non-exhaustive list of Plaintiffs' works infringed by Verizon's subscribers.  All of the sound recordings listed on Exhibit A have been duly registered with the U.S. Copyright Office or, for sound recordings fixed before February 15, 1972, submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

99.     Verizon's subscribers, using Internet access and services provided by Verizon, have unlawfully and without authorization reproduced and distributed via BitTorrent thousands of Plaintiffs' sound recordings, including those listed on Exhibit A and many others.

100.    The foregoing activity by Verizon's subscribers constitutes direct infringement in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq.* and the Music Modernization Act, 17 U.S.C. § 1401.

101.    Verizon is liable as a vicarious infringer for the direct infringements described above.

102.    Verizon has the legal and practical right and ability to supervise and control the infringing activities that occur through the use of its network, including through the enforcement of its AUP and its Copyright Infringement/Repeat Infringer Policy.

103. At all relevant times, Verizon has had a financial interest in, and derived direct financial benefit from, the infringing use of its network. Verizon has derived an obvious and direct financial benefit from its customers' infringement. The ability to use Verizon's high-speed Internet network and facilities to illegally download Plaintiffs' works has served to draw, maintain, and generate higher fees from paying subscribers to Verizon's service. Among other financial benefits, by failing to terminate the accounts of specific repeat infringers known to Verizon, Verizon has profited from illicit revenue through user subscription fees that it would not have otherwise received from repeat infringers and by drawing new subscribers to Verizon's services for the purpose of illegally downloading and distributing protected works. The specific infringing subscribers identified in Plaintiffs' notices, including the particularly egregious infringers identified herein, knew Verizon would not terminate their accounts despite receiving multiple notices identifying them as infringers, and they remained Verizon subscribers to continue illegally downloading and distributing Plaintiffs' works.

104. Verizon is vicariously liable for the unlawful reproduction and distribution of Plaintiffs' works, including but not limited to those listed on Exhibit A, in violation of Plaintiffs' exclusive rights under the copyright laws of the United States.

105. Each infringement of Plaintiffs' sound recordings constitutes a separate and distinct act of infringement. Plaintiffs' claims of infringement against Verizon are timely because they all fall within the Copyright Act's statute of limitations set forth at 17 U.S.C. § 507, as extended by a tolling agreement between the parties.

106. The foregoing acts of infringement by Verizon have been willful, intentional, and purposeful, in disregard of Plaintiffs' rights. Indeed, the sound recordings listed on Exhibit A

represent a non-exhaustive list of works infringed by Verizon's subscribers *after* those particular subscribers were identified to Verizon in multiple prior infringement notices.

107.    As a direct and proximate result of Verizon's willful infringement of Plaintiffs' copyrights and other exclusive rights, Plaintiffs are entitled to statutory damages, pursuant to 17 U.S.C. § 504(c), in an amount of up to $150,000 with respect to each work infringed. Alternatively, at Plaintiffs' election, Plaintiffs shall be entitled to their actual damages pursuant to 17 U.S.C. § 504(b), including Verizon's profits from the infringements, as will be proven at trial.

108.    Plaintiffs are also entitled to their attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment from this Court against Verizon as follows:

a.  For a declaration that Verizon willfully infringed Plaintiffs' copyrights;

b.  For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Verizon's willful violations of Plaintiffs' rights under the U.S. Copyright Act or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages pursuant to 17 U.S.C. § 504(b), including Verizon's profits from infringement, in an amount to be proven at trial;

c.  For an award of Plaintiffs' costs in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

d.  For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Verizon; and

e.  For such other and further relief as the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury of all issues that are so triable.

Dated:  July 12, 2024

Respectfully submitted,

*/s/  Matthew J. Oppenheim*
Matthew J. Oppenheim
Jeffrey M. Gould
Corey Miller
Keith Howell
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
khowell@oandzlaw.com

Alexander Kaplan
Carly K. Rothman
Lauren Bergelson
Bret Matera
OPPENHEIM + ZEBRAK, LLP
461 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
carly@oandzlaw.com
lbergelson@oandzlaw.com
bmatera@oandzlaw.com

*Attorneys for Plaintiffs*