**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UMG RECORDINGS, INC. et al.

              *Plaintiffs*

    v.

VERIZON COMMUNICATIONS INC., et al.

              *Defendants*

No. 24-cv-05285-MMG

Hon. Margaret M. Garnett

ORAL ARGUMENT REQUESTED

---

**MEMORANDUM OF LAW IN SUPPORT OF VERIZON'S**
**<u>MOTION TO DISMISS THE COMPLAINT</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    A.    Music Piracy On The Internet ........................................................................ 2

    B.    Verizon's High-Speed Internet Access Service ........................................... 5

    C.    The Labels' Claims ........................................................................................ 7

ARGUMENT .................................................................................................................... 7

I.    THE LABELS FAIL TO STATE A CONTRIBUTORY-INFRINGEMENT
    CLAIM ................................................................................................................... 8

    A.    Verizon's Alleged Failure To Stop Its Subscribers From Infringing Did
        Not Culpably Contribute To Their Infringement ....................................... 8

        1.    Contributory Infringement Requires Culpable Intent ................................ 8

        2.    The Labels Do Not Allege That Verizon Acted Culpably ........................ 10

        3.    The Labels' Passive-Inaction Theory Upends Traditional
            Common-Law Limits On Aiding-Abetting Liability ................................ 13

    B.    The Labels' Theory Imperils Vast Swaths Of Non-Culpable Conduct ................ 16

    C.    Other Decisions Accepting The Labels' Theory Are Incorrect ............................ 18

II.    THE LABELS FAIL TO STATE A VICARIOUS-INFRINGEMENT CLAIM ............... 21

    A.    The Labels Do Not Allege A Sufficient Financial Interest In
        Infringement .................................................................................................. 21

    B.    The Labels Do Not Allege Sufficient Control Of The Infringement ................... 24

CONCLUSION ............................................................................................................... 25

i

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*23-24 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174 (2d Cir. 2012)..................... 3

*Amazon Servs. LLC v. U.S. Dep't of Agric.*, 109 F.4th 573 (D.C. Cir. 2024)......................... 15, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................7-8, 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................................ 3

*BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*, 2023 WL 3436089
    (E.D. Tex. 2023)...............................................................................................................18, 23

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293 (4th Cir. 2018)...... 14, 18, 19

*Bodyguard Prods., Inc. v. RCN Telecom Servs., LLC*, 2022 WL 6750322
    (D.N.J. 2022)....................................................................................................................18, 23

*Brought to Life Music, Inc. v. MCA Recs., Inc.*, 2003 WL 296561 (S.D.N.Y. 2003)................... 11

*Capitol Recs., Inc. v. Thomas*, 579 F. Supp. 2d 1210 (D. Minn. 2008) ......................................... 4

*Capitol Recs., LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049 (S.D.N.Y. 2015).................. 9

*Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018) .................................. 11, 12, 13

*Concord Music Grp., Inc. v. X Corp.*, 2024 WL 945325 (M.D. Tenn. 2024) .............................. 25

*Costar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) .......................................... 16, 24

*Dallas Buyers Club, LLC v. Doughty*, 2016 WL 1690090 (D. Or. 2016) .................................... 13

*Deutsch v. Arnold*, 98 F.2d 686 (2d Cir. 1938) ........................................................................... 23

*Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003)........................................................................ 24

*Eight Mile Style, LLC v. Spotify USA Inc.*, 2024 WL 3836075 (M.D. Tenn. 2024)...................... 5

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016).................... 9, 14

*Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)............................................. 12, 14, 16

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159
    (2d Cir. 1971)..................................................................................................8, 9, 21, 22, 24

*Gonzalez v. Google*, 2 F.4th 871 (9th Cir. 2021)........................................................................ 19

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869
(S.D.N.Y. 2016) .......................................................................... 7, 10, 12

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)................................................ 15, 20

*In re Charter Commc'ns, Inc. Subpoena Enforcement Matter*, 393 F.3d 771
(8th Cir. 2005).................................................................................................. 3

*In re Frontier Commc'ns Corp.*, 658 B.R. 277 (S.D.N.Y. Bankr. 2024) ................... 18, 19, 20, 21

*Johnson v. Priceline.com, Inc.*, 711 F.3d 271 (2d Cir. 2013) ....................................... 25

*Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376 (3d Cir. 2016)..................................... 9

*Livnat v. Lavi*, 1998 WL 43221 (S.D.N.Y. 1998) ....................................................... 11

*Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693 (2d Cir. 1998) ................... 11

*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)..............................................8, 9, 10, 11,
12, 13, 17, 21

*New York State Telecomms. Ass'n, Inc. v. James*, 101 F.4th 135 (2d Cir. 2024)............................ 2

*Packingham v. North Carolina*, 582 U.S. 98 (2017)....................................................... 10

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ........................... 18

*Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788 (9th Cir. 2007) ...................... 9, 10, 17, 25

*RIAA v. Verizon Internet Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003) ............................... 3, 11, 24

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ........................................................... 8

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ......................21-22, 24

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)............................ 8, 10, 25

*Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222 (4th Cir. 2024) ......................5, 10, 18, 19,
22, 23, 24, 25

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ...........................................................2, 14, 15, 16,
17, 18, 19, 20, 21

*UMG Recordings, Inc. v. Bright House Networks, LLC*, 2020 WL 3957675
(M.D. Fla. 2020) .......................................................................................22, 23, 24

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2018 WL 1096871
(W.D. Tex. 2018)......................................................................................... 18, 22, 23

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067
(D.N.J. 2020)..................................................................................................... 18

*United States v. Eaglin*, 913 F.3d 88 (2d Cir. 2019) ......................................... 5

*United States v. Nieves*, 58 F.4th 623 (2d Cir. 2023) ........................................ 3

*United States v. Thompson*, 728 F.3d 1011 (9th Cir. 2013)............................... 19

*Warner Bros. Recs., Inc. v. Berry*, 2008 WL 1320969 (S.D.N.Y. 2008) ........................................ 3

*Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069 (D. Colo. 2020) ............... 23

*White v. DistroKid*, – F. Supp. 3d –, 2024 WL 3195471 (S.D.N.Y. 2024).................................... 23

## STATUTES

17 U.S.C. § 504(c) ............................................................................................. 5

17 U.S.C. § 512(a) ............................................................................................. 16

17 U.S.C. § 512(*i*)(1) ......................................................................................... 16

17 U.S.C. § 512(*i*)(1)(A) ................................................................................ 6, 16

17 U.S.C. § 512(*l*) ............................................................................................. 16

Pub. L. No. 114-222, §§ 2(a)(4), (b), 130 Stat. 852-83 (2016).................................... 20

## OTHER AUTHORITIES

Restatement (Second) of Torts § 8A cmt. b (1965)........................................... 19

Restatement (Third) of Torts § 28 cmt. d (2020) ........................................... 15, 16, 20

## INTRODUCTION

When people do bad things online, their internet service providers are not typically the ones to blame.  This lawsuit claims otherwise.  The plaintiffs are massive record labels ("Labels") – together worth billions – alleging that some people illegally shared their artists' songs over the internet.  Yet they made a calculated choice not to sue those people.  Nor are they suing any entity that made the file-sharing software used to commit the infringement.  They instead are suing Verizon, which provides high-speed internet access service.  Some Verizon subscribers' internet connections were allegedly used, among many other purposes, to share copyrighted music.  According to the complaint, that infringement is Verizon's fault.

The Labels do not allege that Verizon encouraged music piracy or even wanted it to happen.  All Verizon did was sell general internet access, which some people abused to share copyrighted music with others.  So the Labels say Verizon's "failure to take action" against those people made it responsible for their conduct.  Dkt. 1 ("Compl.") ¶ 60.  For years, the Labels have sought to pin the alleged infringement on Verizon by sending Verizon more than 340,000 automated emails about it.  Those emails demanded that Verizon find the infringers, and either make them stop or kick them off the internet.  And in response to this barrage of emails, Verizon allegedly did nothing.  Because Verizon did not obey these emailed demands to find and stop the infringers, the complaint alleges, Verizon is now secondarily liable for what they did.

Each of the Labels' claims is legally deficient.  *First*, the contributory-infringement claim fails because Verizon did not culpably aid the music piracy.  Contributory infringement requires culpable action, not passive inaction.  The allegations show only the latter.  Verizon's mere failure to cut off subscribers' internet access – no matter how many emails asked it to – did not materially contribute to their infringement.  So the Labels try to obscure that defect with wordplay, reframing Verizon's conduct as actively "continuing to provide its service" to

infringing accounts.  Compl. ¶ 8.  But their rhetoric cannot change that, by allegedly ignoring the Labels' emails, Verizon simply *did not act*.  The Supreme Court recently made that point in addressing the traditional common-law principles that underpin contributory infringement.  *See Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).  Under the common law, a communication provider's conscious refusal to eject wrongdoers from its service is "mere passive nonfeasance" that does not culpably aid their wrongdoing.  *Id.* at 500.  That holding is decisive here.

*Second*, the vicarious-infringement claim fails because Verizon neither controlled nor profited from the alleged infringement.  The Fourth Circuit recently rejected an identical claim against Cox, explaining that Cox's general interest in earning subscription revenues did not mean it was profiting from its subscribers' infringement.  The same reasoning compels dismissal here.

The Labels filed this lawsuit because the same playbook has worked against others.  Over the past decade, they managed to convince other courts (including the Fourth Circuit) to accept similar contributory-infringement claims against large internet service providers.  And the strategy has been lucrative:  the Labels obtained a $1 billion judgment against Cox and extracted settlements from several others.  But the decisions blessing those lawsuits were wrong then and are even less persuasive now.  Indeed, they all rest on the same faulty common-law premise – one imputing culpable intent from passive inaction – that misreads copyright doctrine and conflicts with *Twitter*.  As the first district court to consider the issue after *Twitter*, this Court now has the chance to reject the premise.  It should do so.  The complaint should be dismissed.

## BACKGROUND

### A.     Music Piracy On The Internet

High-speed internet plays an "indispensable role in contemporary society."  *New York State Telecomms. Ass'n, Inc. v. James*, 101 F.4th 135, 141 (2d Cir. 2024).  People use the internet for everything from entertainment to "health care, education, and work opportunities."  *Id.*  Some

also use it for copyright infringement.  Compl. ¶¶ 1, 5-6, 66-70.  One type of infringement occurs via "peer-to-peer" file sharing.  *Id.* ¶ 1.  Peer-to-peer piracy relies on a "decentralized network" through which users exchange copyrighted music over the internet.  *Id.* ¶ 67.  Napster famously popularized such piracy decades ago, *id.*, before the music industry forced it to shut down, *see RIAA v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1231-32 (D.C. Cir. 2003) (describing Napster).  In the years since, peer-to-peer file-sharing software has become "even more robust and efficient."  Compl. ¶ 67.  Most now use the "BitTorrent" protocol.  *Id.* ¶¶ 68-70.[1]

The Labels "have employed many means" to combat peer-to-peer piracy "[o]ver the past 25 years."  *Id.* ¶ 71.  For a time, they sued the infringers directly.  *See RIAA*, 351 F.3d at 1232.  To do so, the Labels identified an internet protocol ("IP") address engaged in peer-to-peer file-sharing and "trace[d] the user" to an internet service provider ("ISP").  *Id.*; *see* Compl. ¶ 75.  From there, the Labels filed "'John Doe' lawsuits" and used the IP address to subpoena the ISP for the infringer's identity.  *In re Charter Commc'ns, Inc. Subpoena Enforcement Matter*, 393 F.3d 771, 775 n.3 (8th Cir. 2005).  Verizon has long cooperated with such subpoenas.  And for a few years, the Labels appeared content with the results.  They filed "John Doe" cases in "courts across the country," *id.*, then sued the people allegedly doing the illegal file sharing.

But the Labels' tactics in suing internet users proved unpopular.  The Labels' blizzard of lawsuits targeted a 12-year-old girl,[2] a homeless man,[3] and several grandparents.[4]  They obtained

---

[1] Verizon accepts the allegations solely for pleading purposes.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  The Court may also take limited judicial notice of the news reports and public websites cited below.  *See United States v. Nieves*, 58 F.4th 623, 634 (2d Cir. 2023); *23-24 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 n.7 (2d Cir. 2012).

[2] CNN, *12-Year-Old Settles Music Swap Lawsuit* (Feb. 18, 2004), https://perma.cc/A2PU-L27K.

[3] *Warner Bros. Recs., Inc. v. Berry*, 2008 WL 1320969, at *4 n.1 (S.D.N.Y. 2008).

[4] Benny Evangelista, *Download Lawsuit Dismissed / RIAA Drops Claim That Grandmother Stole Online Music*, S.F. Chron. (Sept. 25, 2003), https://bit.ly/3ZbIiit; BBC News, *Grandfather Caught In Music Fight* (Sept. 9, 2003), https://perma.cc/65AB-CYQ5.

a $222,000 judgment against a single mother who had shared 24 songs online.[5]  They bombarded colleges with litigation threats about students swapping music in their dorms.[6]  And after one alleged file-sharer died during a lawsuit, the Labels threatened "depositions" of his grieving family unless they settled.[7]  These cases, one court observed, pitted the massive "record companies" and their "large lawfirms" against helpless "individuals who don't have lawyers and don't have access to lawyers and who don't understand."[8]  Nobody, except perhaps the Labels, thought it was a "good situation or a fair situation."  *Alaujan* Tr. 9:19-20.  In late 2008, the mounting "public-relations disaster" forced the Labels to find a new litigation target.[9]

Enter the ISPs.  No longer willing to directly sue the people sharing their works online, the Labels devised a profitable workaround:  sue whoever provided the internet connection used to do it.  In the years that followed, the Labels filed "very public lawsuits" against most of the large ISPs in the country.  Compl. ¶ 71.  The cases all follow the same playbook.  First, the Labels hire a vendor to crawl BitTorrent and identify users purportedly sharing copyrighted music.  *Id.* ¶ 75.  Then, the vendor traces the user's IP address to an ISP and sends that provider an automated email – the Labels call them "notices," *id.* ¶ 1 – alleging that someone used the listed IP address to pirate music.  *Id.* ¶¶ 75-77.  The "notices" demand that the ISP in turn "contact [the] subscriber or take other appropriate action."  *Id.* ¶ 76.  If the provider then fails to

---

[5] *Capitol Recs., Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1227 (D. Minn. 2008).

[6] *See*, *e.g.*, Charles R. Nesson & Wendy M. Seltzer, *Protect Harvard From The RIAA*, The Crimson (May 1, 2007), https://perma.cc/99U5-LYSR.

[7] Mot. to Stay Case & Extend All Deadlines at 2, *Warner Bros. Recs. Inc. v. Scantlebury*, No. 2:05-cv-74394-ADT-VMM (E.D. Mich. Aug. 1, 2006) (Dkt. 13).

[8] Ex. 1, Mot. Hr'g Tr. 8:15-20, *Capital Recs., Inc. v. Alaujan*, No. 03-cv-11661-NG (D. Mass. June 17, 2008) ("*Alaujan* Tr.").  All exhibit cites are to the declaration of Joshua D. Branson.

[9] Sarah McBride & Ethan Smith, *Music Industry to Abandon Mass Suits*, Wall. St. J. (Dec. 19, 2008), https://on.wsj.com/47bkXzb.

terminate any subscriber who accrues "multiple notices" – that is, two – the ISP becomes

"secondarily liable" for all future acts of infringement over the subscriber's connection. *Id.* ¶ 10.

This strategy has proved lucrative. It has allowed these multibillion-dollar record

companies to leverage statutory damages under the Copyright Act – which can run up to

$150,000 per work, 17 U.S.C. § 504(c) – against deep-pocketed companies rather than

grandmothers and teenagers. Indeed, the Labels obtained $1 billion in damages against Cox for

the infringement of just 10,017 songs. *See Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222,

227 (4th Cir. 2024) ("*Cox II*").[10] That worked out to $99,000 per song, most of which were

available on iTunes for $1.29 or less. The disparity illustrates what one court recently observed

about the "Copyright Act's generous damages provisions:" claiming to "be[] the victim of

infringement is, in many instances, more remunerative" than actually stopping the infringement.

*Eight Mile Style, LLC v. Spotify USA Inc.*, 2024 WL 3836075, at *22 (M.D. Tenn. 2024).

### B.    Verizon's High-Speed Internet Access Service

Verizon "provides wireless and wireline data and Internet services to millions of

residential and business subscribers." Compl. ¶ 55. In 2023, the complaint alleges, Verizon

served 115 million wireless retail customers and 9 million home-internet customers. *Id.* ¶ 56. It

also provided wireless broadband service to roughly 30 million business customers and wired

broadband service to roughly 2 million more. *Id.* Verizon's customers – and their families,

friends, employees, and patrons – use the internet for many lawful purposes. Internet access is

now a vital part of "everyday life." *United States v. Eaglin*, 913 F.3d 88, 98 (2d Cir. 2019).

Verizon charges monthly "subscription fees for access to [its] high-speed Internet

service." Compl. ¶ 57. It follows a "tiered pricing structure" under which customers pay "higher

---

[10] The Fourth Circuit vacated that award and remanded for a new trial on damages. *See Cox II*, 93 F.4th at 227. Both sides have filed pending certiorari petitions.

monthly fee[s]" for "faster downloading speeds." *Id.* The online "consumer marketing materials" the complaint cites (¶ 58) explain the benefits of those faster speeds, highlighting Verizon's "fiber-optic internet" as delivering "the bandwidth and power you need to run lots of devices at the same time with less lag and buffering than cable." Ex. 2 at 4.

Verizon's has policies that expressly discourage customers from using the internet for piracy. Compl. ¶ 60 (citing Ex. 3). Customers must "agree not to use" Verizon's service "for any unlawful purpose," including "violation of copyright laws." Ex. 3 § 5.2. Verizon further urges customers not to "use Verizon's systems or servers in any manner" that infringes "intellectual property rights." *Id.* at Ex. B § 3. And it warns them about "Verizon's policy" of "terminat[ing] the account of repeat copyright infringers in appropriate circumstances." *Id.* at Ex. B § 3.

The latter reference is to Verizon's "Repeat Infringer Policy," which Verizon explains on the website the Labels cite. *See* Compl. ¶ 63 (citing Ex. 4). Verizon maintains that policy under the Digital Millennium Copyright Act ("DMCA"), which immunizes ISPs from copyright liability if they "adopt[] and reasonably implement[]" a policy "provid[ing] for the termination" of "repeat infringers" in "appropriate circumstances." 17 U.S.C. § 512(*i*)(1)(A). If this case proceeds, Verizon will prove that it reasonably implemented such a policy. But Verizon does not ask the Court to resolve that fact-bound defense on the pleadings. *Cf.* Compl. ¶¶ 74-80.

Relevant here, Verizon's policy states that it does "not review, process, or otherwise take action" on peer-to-peer infringement notices "sent via email." *Id.* ¶ 63, Ex. 4 at 2. Verizon instead offers copyright owners its "Anti-Piracy Cooperation Program," which allows them to "submit notices electronically . . . using a Verizon-assigned API key for security." Ex. 4 at 2. For notices properly submitted through that automated system, "Verizon will forward, for free, up to 50,000" notices "per copyright owner per month." *Id.* Many of the largest movie studios

and other copyright owners now use Verizon's program, and Verizon has terminated hundreds of accounts under that program, consistent with its Repeat Infringer Policy.  But the Labels – putative competitors acting through their trade association, the Recording Industry Association of America ("RIAA"), *see* Compl. ¶ 75 – have made the concerted choice to boycott it, *id.* ¶¶ 61-63, 75-78.  Rather than use Verizon's program, the RIAA's agent bombards Verizon's inbox with hundreds of thousands of "email[s]" the Labels know Verizon does "not review."  *Id.* ¶ 63.

### C.     The Labels' Claims

The Labels claim that their emails make Verizon liable for secondary copyright infringement.  Compl. ¶¶ 1, 10.  They allege those emails notified Verizon that some "subscribers were actively utilizing its service to infringe Plaintiffs' copyrighted works."  *Id.* ¶ 64.  When Verizon received the emails, the Labels allege, it should have exercised its "right and ability to stop th[e] infringement."  *Id.*  By this, the complaint means Verizon should have "suspend[ed] or terminat[ed] the accounts of repeat infringers."  *Id.*; *see id.* ¶¶ 8-9, 60, 65, 81-83.  In failing to do so, Verizon allowed its "customers" to "continue[] using Verizon's services to infringe."  *Id.* ¶ 64.  But beyond continuing to provide those customers with generally available internet service, Verizon did not allegedly take any other steps toward them.  *Id.* ¶¶ 55-59, 77-84.

The Labels do not allege that Verizon itself infringed any copyright.  They instead bring claims for contributory (*id.* ¶¶ 85-96) and vicarious (*id.* ¶¶ 97-108) infringement.  The complaint also appends a list of 17,335 works that Verizon subscribers allegedly infringed.  Dkt. 1-1.

### ARGUMENT

Familiar pleading principles govern the Labels' secondary-copyright-infringement claims.  *See*, *e.g.*, *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 886, 897-90 (S.D.N.Y. 2016) (dismissing such claims).  To survive dismissal, the Labels must "state[]

a plausible claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A plausible claim requires specific "factual content," not "labels and conclusions."  *Id.* at 678.  The complaint fails that test.

# I.    THE LABELS FAIL TO STATE A CONTRIBUTORY-INFRINGEMENT CLAIM

The Copyright Act's text does not "render anyone liable for infringement committed by another."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434 (1984).  But decades ago, when courts still inferred secondary liability from statutory silence, the Supreme Court recognized "the concept of contributory infringement."  *Id.* at 435.[11]  In the Second Circuit's classic formulation, contributory infringement applies to "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another."  *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).  The Labels do not plead that Verizon played any such role in the alleged infringement.

## A.    Verizon's Alleged Failure To Stop Its Subscribers From Infringing Did Not Culpably Contribute To Their Infringement

### 1.    Contributory Infringement Requires Culpable Intent

The Labels' contributory-infringement claim fails because Verizon did not provide internet service "with the object of promoting its use to infringe copyright."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37 (2005).  Culpable intent is foundational to contributory infringement.  In the Supreme Court's only modern case addressing such infringement, it stressed the need for "purposeful, culpable expression and conduct."  *Id.* at 937.  It also explained that courts may not "find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement," without some "other evidence of intent" showing a provider's "intentional facilitation of [its] users' infringement."  *Id.* at 939 & n.12.

---

[11] Courts no longer infer secondary liability when the statute "is silent."  *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013).  Verizon disagrees that the Copyright Act authorizes secondary-liability claims and preserves the argument for further review.

Secondary actors can express culpable intent in several ways.  Some "encourage direct infringement" by "advertising an infringing use" of a service, or by "instructing" their customers "how to engage in an infringing use."  *Id.* at 936.  Courts often call this "inducement."  *Id.* at 937.  The "classic instance of inducement" is a "solicitation" that a defendant "design[s] to stimulate others" to infringe.  *Id.*  A product seller, for example, culpably induces infringement when it "create[s]" marketing materials with an infringing image and "require[s] [its] distributors to use the materials."  *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 387-88 (3d Cir. 2016).

A secondary actor can also act culpably by distributing a "tool intended for infringing use."  *Grokster*, 545 U.S. at 940 n.13.  In some cases, courts "imput[e] culpable intent" from the design of the product itself.  *Id.* at 934.  Napster, for example, was liable as a contributory infringer because the platform's "*sole purpose*" was to "provide a forum for easy copyright infringement."  *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788, 799 n.10 (9th Cir. 2007).

In file-sharing cases, as elsewhere, courts have demanded some "clear expression or other affirmative steps taken to foster infringement."  *Grokster*, 545 U.S. at 936-37.  A music-streaming service that intentionally makes unlicensed works available to its users is a good example.  *See Capitol Recs., LLC v. Escape Media Grp., Inc.*, 2015 WL 1402049, at *43 (S.D.N.Y. 2015).  So is a company whose CEO "encourage[s] his employees" to "make more music available for user download" from its website.  *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 100 (2d Cir. 2016).  And in *Gershwin* itself, a concert organizer cultivated a "market" for "copyrighted compositions" and orchestrated the concerts' "formation and direction."  443 F.2d at 1162-63.  These cases all illustrate the type of "action[] directed to promoting infringement" that can create contributory infringement.  *Grokster*, 545 U.S. at 935.

But other types of behavior are not so culpable. One is the "design or distribution of a product capable of substantial lawful use." *Id.* at 933. For such products, courts may not "imput[e] culpable intent" from the product itself, even when the seller knows some customers will use it to infringe. *Id.* at 934. Thus, in *Sony*, the Supreme Court famously considered whether to impose liability on a VCR seller that knew some customers would "use [the VCRs] to infringe." *Id.* at 931. The Court said no. Because VCRs were "capable of substantial noninfringing uses," merely selling VCRs to infringers was not culpable. *Sony*, 464 U.S. at 442.

The Supreme Court also stressed that a "failure to take affirmative steps" is not culpable. *Grokster*, 545 U.S. at 939 & n.12. The very concept of contributory infringement, after all, contemplates "purposeful, culpable expression and conduct." *Id.* at 937. For that reason, courts have long held that "mere inaction cannot state a claim for contributory copyright infringement." *Gym Door*, 206 F. Supp. 3d at 900. When a secondary defendant has the "power to undermine the commercial viability of infringement" but chooses not to, its choice to let the infringement happen does not "materially contribute to that infringement." *Visa*, 494 F.3d at 800.

### 2.    The Labels Do Not Allege That Verizon Acted Culpably

Verizon's alleged conduct bears no resemblance to the culpable aid courts traditionally require in contributory-infringement cases. Verizon provides internet service. Compl. ¶¶ 4, 55-57. "Many activities of modern life demand internet service," *Cox II*, 93 F.4th at 232, and Verizon's customers use it for everything from attending school to streaming movies. On its face, therefore, the internet is nothing like a file-sharing platform designed "for the purpose of facilitating piracy." *Visa*, 494 F.3d at 801. It is instead a vital public forum, where people "debate religion and politics," "look for work," or even "petition their elected representatives." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Such activities all depend on the very "high-speed Internet service" the Labels recast as contributory infringement. Compl. ¶ 57.

The Labels claim Verizon was culpable because it supposedly knew some people were using its subscribers' accounts to commit music piracy. Compl. ¶¶ 71-81. But the Labels do not allege that Verizon had real-time visibility into the piracy as it was happening. Verizon was not like a website hosting an infringing video it could delete; it was a "mere conduit" between "subscribers' computers" that neither inspected its subscribers' internet usage nor "stored" infringing content on its own servers. *RIAA*, 351 F.3d at 1235-36. The Labels also do not (and cannot) allege that Verizon took any "affirmative steps" to "foster" piracy by its users. *Grokster*, 545 U.S. at 937. "Providing internet access" to infringers cannot itself count as such a step, any more than selling VCRs did. *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1149 (9th Cir. 2018); *see Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 707 (2d Cir. 1998) (distributing "products that might be used incidentally for infringement" not enough). So the Labels must allege some other indication of "culpable intent." *Grokster*, 545 U.S. at 934.

The complaint fails to do so. It does not allege that Verizon "influence[d] or encourage[d]" anyone to share copyrighted music. *Matthew Bender*, 158 F.3d at 706. It does not allege that Verizon actively "participated" in anyone's decision to share music via BitTorrent. *Brought to Life Music, Inc. v. MCA Recs., Inc.*, 2003 WL 296561, at *2 (S.D.N.Y. 2003). Nor does it allege that Verizon "acted in concert with [any] direct infringer." *Livnat v. Lavi*, 1998 WL 43221, at *3 (S.D.N.Y. 1998). Rather, the only action Verizon took was to continue providing infringing accounts with the same routine internet service it offers everyone. Compl. ¶¶ 55-84. The Labels cannot portray that as culpable, so they have to focus on Verizon's "failure to take action." *Id.* ¶ 60; *see id.* ¶¶ 65, 81-83. Had Verizon cut off the accounts used for infringement, the Labels claim, Verizon could have "prevented its repeat infringer subscribers from using its service to infringe." *Id.* ¶ 65. In other words, Verizon aided the piracy by failing to stop it.

Such passive inaction is not contributory infringement. *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 758 (7th Cir. 2012) (social-bookmarking site's failure to "ban repeat infringers" did not "contribut[e] to infringement"); *Gym Door*, 206 F. Supp. 3d at 900 (same for regulator's "refus[al] to take action" against infringing contractor). Without some "evidence of intent," the Supreme Court emphasized, a mere "failure to take affirmative steps to prevent infringement" is not the same as culpably aiding that infringement. *Grokster*, 545 U.S. at 939 n.12. The Labels allege only the former. Verizon's alleged refusal to kick people off the internet epitomizes the "mere inaction" courts have long held insufficient. *Gym Door*, 206 F. Supp. 3d at 900.

The Labels sometimes try to mask that defect with active-sounding verbs. *E.g.*, Compl. ¶¶ 7 ("deliberately chose to ignore"), 61 ("takes active steps"), 64 ("condoned its subscribers' illegal activity"). The Court should disregard the labels and focus on the facts alleged. *See Iqbal*, 556 U.S. at 679. And the core fact alleged is that Verizon "chose to ignore Plaintiffs' notices" of infringement. Compl. ¶ 7. *Choosing to ignore* an email is just another way of saying that Verizon *took no action*. In one instructive case, the Seventh Circuit confronted similar claims that a social-bookmarking site "received 'takedown' notices" urging it "to ban repeat infringers from its website" but "failed to comply with the notices." *Flava Works*, 689 F.3d at 758. The court held the notices "irrelevant" because the website's passivity was not "contributing to the infringement" in the first place. *Id.* The same is true here. The Labels' emailed demands that Verizon do something did not transform its inaction into action.

Other courts have rejected liability for those who similarly "fail[ ] to police [their] internet service." *Cobbler Nevada*, 901 F.3d at 1148. In *Cobbler Nevada*, a copyright owner sued the "registered subscriber of an infringing IP address." *Id.* at 1145. The subscriber ran "an adult care home" and bought "internet service" for his residents' use. *Id.* He received "over 400

notices of infringing activity" yet "refused to take any action whatsoever" to stop residents from using his internet connection to infringe. *Id.* at 1146. The Ninth Circuit held his failure to act did not "materially contribute[ ]" to the infringement. *Id.* at 1148. Another court likewise held that a subscriber who "failed to take affirmative steps to prevent infringement" by others using his internet connection was not secondarily liable. *Dallas Buyers Club, LLC v. Doughty*, 2016 WL 1690090, at *9 (D. Or. 2016). That was true even though the subscriber ignored "multiple Comcast e-mails notifying him his IP address had been identified with infringing activity." *Id.*

The claim against Verizon is even weaker. In these individual-subscriber cases, the defendants at least had a personal relationship with the likely infringers. In *Dallas Buyers Club*, for example, the defendant supplied internet access to his "roommates," but "never spoke" to them about the notices nor took "any action to prevent further infringing." 2016 WL 1690090, at *3. Verizon's relationship with each alleged infringer here – perhaps a subscriber, or perhaps a subscriber's family member, patron, or someone exploiting an open WiFi connection – is further removed. If copyright notices do not require a subscriber to "block access" to others using his own internet connection, *Cobbler Nevada*, 901 F.3d at 1149, Verizon surely has no duty to turn off the connection altogether and cast entire homes or businesses off the internet.

### 3. The Labels' Passive-Inaction Theory Upends Traditional Common-Law Limits On Aiding-And-Abetting Liability

Traditional secondary-liability principles reinforce that Verizon did not act culpably. Contributory infringement "emerged from common law principles," *Grokster*, 545 U.S. at 930, and hinges on "fault-based liability derived from the common law," *id.* at 934-35. Aiding-and-abetting is its equivalent. As courts have recognized, contributory infringement is a species of aiding-and-abetting liability. *See EMI*, 844 F.3d at 100 (contributory infringer "aided and abetted"); *Flava Works*, 689 F.3d at 755 ("aider and abettor"). Indeed, the Fourth Circuit

accepted the Labels' theory by deriving it from "the law of aiding and abetting." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 309 (4th Cir. 2018) ("*Cox I*").

The Supreme Court recently explained how to apply common-law aiding-and-abetting principles to services that are "generally available to the internet-using public." *Twitter*, 598 U.S. at 498. *Twitter*'s articulation of the common law forecloses the Labels' claims.

    a.    *Twitter* addressed civil aiding-and-abetting claims under the Antiterrorism Act. *Id.* at 497. There, victims of an ISIS attack sued social-media platforms for allegedly aiding the attack. "ISIS and its adherents," the victims alleged, had "used these platforms for years as tools for recruiting, fundraising, and spreading their propaganda." *Id.* at 481. The platforms were allegedly "crucial to ISIS' growth." *Id.* And the defendants "kn[ew] that ISIS has used their platforms for years," yet "knowingly allow[ed] ISIS and its supporters" to continue doing so to "fundraise" and "radicalize new recruits." *Id.* at 481-82. The victims claimed the platforms thus "provid[ed] material support to ISIS" and culpably aided ISIS's terrorist attacks. *Id.* at 498-501.

The Supreme Court rejected that claim as inconsistent with the "common-law tradition" of aiding-and-abetting. *Id.* at 484-85. It credited the allegations that the social-media platforms "knew they were playing some sort of role in ISIS' enterprise." *Id.* at 497. Still, the claims were deficient because they "rest[ed] less on affirmative misconduct and more on an alleged failure to stop ISIS from using the[] platforms." *Id.* at 500. The victims – like the Labels here – tried to portray the platforms' failure to terminate ISIS supporters as "active, substantial assistance." *Id.* at 499. But the Supreme Court held it was "mere passive nonfeasance." *Id.* at 500. The conscious decision to continue servicing ISIS accounts did not amount to "culpable" aid. *Id.*

*Twitter*'s reasoning controls here. The Court recognized that social-media platforms – which "bad actors" can exploit for unlawful ends – are like "cell phones, email, or the internet

14

generally." *Id.* at 499.  And "internet or cell service providers," the Court stressed, do not "incur culpability merely for providing their services to the public." *Id.*  Just as that principle governed Twitter's "passive aid" to terrorists on its platform, *id.*, so does it govern Verizon's passive aid to alleged infringers on its network. *Twitter* made clear that the two are the same.  In words that could have been written for this case, the Court explained it would thrust "aiding and abetting far beyond its essential culpability moorings" to make a "communication provider liable . . . merely for knowing that . . . wrongdoers were using its services and failing to stop them." *Id.* at 503. Verizon's alleged failure to stop infringers from using the internet exemplifies the point.

**b.**      The "common-law principles" *Twitter* invoked confirm that conclusion. *Id.* at 491-92.  Under the common law, secondary liability requires "conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493.  The Labels do not allege such participation.

*First*, the common law traditionally does not view "routine transactions" as culpable assistance. *Twitter*, 598 U.S. at 491; *see* Restatement (Third) of Torts § 28 cmt. d (2020) ("Third Restatement") ("routine professional services" not enough for aiding-and-abetting).  When it comes to routine services like internet access or internet commerce, courts typically view the service provider as passive. *Compare Amazon Servs. LLC v. U.S. Dep't of Agric.*, 109 F.4th 573, 575 (D.C. Cir. 2024) (no aiding-and-abetting under *Twitter* where Amazon's "fulfillment service" was "a routine business service" available to broader public), *with Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983) (upholding liability for back-office tasks performed "in an unusual way under unusual circumstances").  The key is whether the service provider "treated [the wrongdoer] any differently from anyone else." *Twitter*, 598 U.S. at 500.  No allegations suggest that Verizon did so here.  Verizon's relationship with the alleged infringers was "the same" as with its millions of "other users:  arm's length, passive, and largely indifferent." *Id.*

*Second*, the common law traditionally "does not impose liability for mere omissions, inactions, or nonfeasance" absent "some independent duty to act." *Id.* at 489; *see* Third Restatement § 28 cmt. d (similar). So without some duty to act, Verizon had every right to "ignore[ ]" the "hundreds of thousands of Plaintiffs' notices" the Labels emailed to its "inbox." Compl. ¶ 63. Put simply, an ISP does not assume a duty to act whenever somebody sends it an email demanding action. On the contrary: the Labels, like the *Twitter* plaintiffs, can "identify no duty" requiring "communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends." *Twitter*, 598 U.S. at 501.

On this score, the DMCA tracks the common law. The DMCA gives ISPs the *option* of reasonably implementing a policy providing for "termination in appropriate circumstances" of "repeat infringers." 17 U.S.C. § 512(*i*)(1)(A). Providers who do so are entitled to an absolute affirmative defense. *Id.* § 512(a). But the DMCA declines to make such policies mandatory. *Id.* § 512(*l*) (failure to "qualify for limitation of liability . . . shall not bear adversely" on "any other defense"). The Labels' allegations (¶¶ 72-84) flip that principle on its head. They seek to morph the DMCA's "limitations of liability," 17 U.S.C. § 512(*i*)(1), into a freestanding "responsibility to act" against repeat infringers, Compl. ¶ 83. Had Congress intended to impose that responsibility, it would have done so in the statute. *See Costar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 552-53 (4th Cir. 2004) (treating DMCA as affirmative duty is "exactly backward"); *Flava Works*, 689 F.3d at 758 ("implausible" to view DMCA as "expand[ing]" contributory infringement).

### B.  The Labels' Theory Imperils Vast Swaths Of Non-Culpable Conduct

This Court should decline to stretch contributory infringement "beyond its essential culpability moorings." *Twitter*, 598 U.S. at 503. Those moorings are vital to keep secondary copyright liability "from trenching on regular commerce." *Grokster*, 545 U.S. at 937. Indeed,

courts should be vigilant in policing the limits of contributory infringement, lest liability sweep in countless "number[s] of peripherally-involved third parties." *Visa*, 494 F.3d at 800.

The claims here threaten to do just that. For the Labels, anyone who "refuse[s]" their demands "to take action" against infringement becomes an accomplice to it. Compl. ¶ 4. Take a power company. The Labels could send similar "infringement notices" demanding that a power company stop its "customers from using its [electricity] to infringe." *Id.* Then, if the company did not cut off the power to an infringer's house, the Labels could say it "refused to take action" and so "condoned" the infringement. *Id.* ¶¶ 4, 64. They could level the same accusations at colleges (for not expelling infringers); landlords (for not evicting them); or operating-system providers (for not canceling their software license). Like Verizon, these other actors provide basic services – electricity, a place to live, a functioning computer – that arguably "enable[ ]" infringers to "illegally download" music. *Id.* ¶ 80. Verizon is no more culpable than they are.

By "run[ning] roughshod over the typical limits on tort liability," the Labels' claims also threaten consequences beyond copyright. *Twitter*, 598 U.S. at 503. Under their theory, a "communication provider" acts culpably whenever it knowingly "fail[s] to stop" some "bad actor[ ]" from exploiting its service. *Id.* Someone who thinks a business counterparty is committing wire fraud could send Verizon "email notices," Compl. ¶ 63, demanding that it sever the alleged fraudster's internet access. Someone else who thinks an acquaintance is using the internet to "transmit emails" with "tortious messages" could demand the same thing. *Twitter*, 598 U.S. at 489. Or someone could demand that Verizon cut off a neighbor's "cell service," alleging that the neighbor was using "cell phones" to broker "illegal drug deals." *Id.* at 499. If Verizon refused or ignored any of these emailed demands, the Labels' theory would treat it as an aider and abettor. The common law does not tolerate liability theories so boundless.

17

**C.    Other Decisions Accepting The Labels' Theory Are Incorrect**

A handful of decisions have accepted the Labels' contributory-infringement claims against other large ISPs.[12]  None is correct.  *Twitter*, which the Supreme Court decided after briefing finished in all but one of these cases, now precludes their reasoning.

1.    The courts to accept the Labels' theory employed common-law reasoning that *Twitter* has since rejected.  They inferred culpable contribution from an ISP's "failure to take remedial action against repeat copyright infringers," reasoning that a failure to act was "tantamount to encouraging infringement."  *RCN I*, 2020 WL 5204067, at *9; *see, e.g., Grande*, 2018 WL 1096871, at *9 ("failure to act").  That inference rested on the premise that culpable "'intent may be imputed based on 'a service provider's knowing failure to prevent infringing actions.'"  *Cox I*, 881 F.3d at 308 (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007)).  *Twitter* now forecloses that premise.  Continuing to provide routine service to a tortfeasor is "passive nonfeasance," not culpable aid.  *Twitter*, 598 U.S. at 500.

*Twitter* also undercuts those courts' rationale for portraying an ISP's conduct as active. The Fourth Circuit, for example, described Cox as "cho[osing] to continue providing monthly internet access" to infringers "despite believing the online infringement would continue."  *Cox II*, 93 F.4th at 236.  But *continuing* to provide the *same* routine service does not involve any action.  *See Twitter*, 598 U.S. at 500-03.  In *Twitter*, the social-media companies similarly "stood back and watched" while ISIS continued to abuse their platforms.  598 U.S. at 499.  The Ninth Circuit had framed their conduct just like the Labels do, noting allegations that "when defendants

---

[12] *See Cox II*, 93 F.4th at 233-37; *Cox I*, 881 F.3d at 306-12; *In re Frontier Commc'ns Corp.*, 658 B.R. 277 (S.D.N.Y. Bankr. 2024); *BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*, 2023 WL 3436089, at *9-13 (E.D. Tex. 2023); *Bodyguard Prods., Inc. v. RCN Telecom Servs., LLC*, 2022 WL 6750322, at *7-9 (D.N.J. 2022) ("*RCN II*"); *UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *8-10 (D.N.J. 2020) ("*RCN I*"); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2018 WL 1096871, at *3-9 (W.D. Tex. 2018).

received complaints about ISIS's use of their platforms," they ignored them and thus "permitted ISIS-affiliated accounts to remain active." *Gonzalez v. Google*, 2 F.4th 871, 883 (9th Cir. 2021). Yet the Supreme Court reversed. Conscious or not, a service provider's failure to cut off a wrongdoer is "passive assistance," not "active abetting." *Twitter*, 598 U.S. at 499.[13]

The same point undercuts the Fourth Circuit's use of the Restatement principle that "if a person knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Cox I*, 881 F.3d at 307 (quoting Restatement (Second) of Torts § 8A cmt. b (1965)). On its face, that presumption requires a culpable "act." It does not apply when, as in *Twitter* and as here, a service provider fails to "remove[ ]" wrongdoers. 598 U.S. at 498. In that case, the law does *not* impute culpable intent, "lest mostly passive actors like [ISPs] become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 491.

    2.    Only one court has considered *Twitter* in addressing the Labels' claims. *See Frontier*, 658 B.R. at 288-303. The bankruptcy court there mistakenly called *Twitter* a case about "secondary criminal liability," *id.* at 288, rather than "civil liability," *Twitter*, 598 U.S. at 478. It then misread *Twitter* in several other ways, in a not-yet-appealed ruling that will be subject to de novo review in district court. The bankruptcy court's ruling is unpersuasive.

    *Frontier* first distinguished *Twitter* as addressing "terrorist acts," which it thought uninformative of "what constitutes culpable conduct in the copyright context." 658 B.R. at 303. But *Twitter* did not hinge on anything unique about terrorism. Quite the opposite: it applied

---

[13] The Fourth Circuit also compared Cox's failure to terminate infringers to "[l]ending a friend a hammer" with "knowledge that the friend will use it to break into a credit union." *Cox II*, 93 F.4th at 236. But in the case that court cited, the hammer-supplying defendant and a third co-conspirator, who "brought [a] thermal lance," met with the robber before the crime. *United States v. Thompson*, 728 F.3d 1011, 1013 (9th Cir. 2013). Arming a bank robber is nothing like supplying a "generally available" service "to the internet-using public." *Twitter*, 598 U.S. at 498.

concepts that "ha[ve] animated aiding-and-abetting liability for centuries." 598 U.S. at 493.

Indeed, the D.C. Circuit recently relied on *Twitter* in rejecting claims about animal importation,

noting that it governs "civil aiding-and-abetting liability generally." *Amazon*, 109 F.4th at 575.

If anything, the terrorism-copyright distinction cuts against liability here. Common-law

courts employ a "proportionality test," under which "a defendant's responsibility for the same

amount of assistance increases with the blameworthiness" of the principal tort. *Halberstam*, 705

F.2d at 484 n.13; *see* Third Restatement § 28 cmt. d ("enormity of a wrong" may warrant liability

for "lesser acts"). Music piracy, though wrong, is less "blameworth[y]" than an ISIS massacre.

*Halberstam*, 705 F.2d at 484 n.13. So under traditional common-law principles, the threshold for

culpably aiding copyright infringement should be higher – not lower – than for aiding terrorist

attacks. That is especially true because the Antiterrorism Act (unlike the Copyright Act) provides

for secondary liability in its text, which Congress enacted to "provide civil litigants with the

broadest possible basis" to sue terrorist funders. Pub. L. No. 114-222, §§ 2(a)(4), (b), 130 Stat.

852-83 (2016). If inaction cannot satisfy even that broad statute, it comes nowhere close here.

*Frontier* also discerned a closer "nexus" between the ISP and infringement than between

Twitter and the ISIS attack it was accused of aiding. 658 B.R. at 301. The court emphasized that

piracy "took place via Frontier's network itself," whereas ISIS did not plan the shooting on

social media. *Id.* But the court mistook why *Twitter* viewed the "relationship between

defendants and the [ISIS] attack [as] highly attenuated." 598 U.S. at 500. The attenuated nexus

flowed from the dearth of "allegations that defendants treated [the wrongdoers] any differently

from anyone else." *Id.* There were no such allegations in *Twitter*, and there are none here.

*Frontier* also thought that only contributory-infringement claims alleging "inducement" –

rather than "material contribution" – require the "affirmative ill intent and action" *Twitter*

demands. 658 B.R. at 299-300. But *Twitter* was a "material support" case, not an inducement case. 598 U.S. at 499. The Supreme Court thus addressed the standard for when a defendant has "given knowing and substantial assistance to the primary tortfeasor" – the very question here. *Id.* at 491. In any event, the bankruptcy court's distinction was flawed. Inducement and material contribution are not separate doctrines with separate elements; they are examples of "culpable conduct" that both support aiding-and-abetting liability. *Twitter*, 598 U.S. at 490; *see Grokster*, 545 U.S. at 942 (Ginsburg, J., concurring) (both "categories" capture "culpable behavior"). The material-contribution variant, like any aiding-and-abetting theory, requires "some 'affirmative act'" taken to aid the principal tort. *Twitter*, 598 U.S. at 490. The Labels allege none.

## II.    THE LABELS FAIL TO STATE A VICARIOUS-INFRINGEMENT CLAIM

A defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop [it]." *Grokster*, 545 U.S. at 930. The Labels must plead two elements: that Verizon had (1) "a direct financial interest" in the infringement, and (2) the "right and ability to supervise the infringing activity." *Gershwin*, 443 F.2d at 1162. They allege neither.

### A.    The Labels Do Not Allege A Sufficient Financial Interest In Infringement

The Labels do not allege that Verizon profited from online music piracy. Vicarious liability demands more than some loose economic connection to infringement. The defendant must have "an obvious and direct financial interest in the exploitation of copyrighted materials." *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). The "dance hall cases" are the classic example. *Id.* at 307. Dance-hall managers there "hire[d] a dance band" that performed "copyrighted music" to attract customers to their venues. *Id.* The infringing performances thus gave the hall managers "a source of customers and enhanced income." *Id.* *Shapiro* later applied that principle to a department store that extracted a percentage of its concessionaire's revenues from selling pirated records; the more pirated records sold inside the

store, the more money the store made.  *Id.* at 308-09.  And in *Gershwin*, the concert organizer

likewise "derived substantial financial benefit" from its artists' performance of copyrighted

works at the concerts it orchestrated.  443 F.2d at 1163.  In each case, the defendant reaped a

"financial benefit" that "flow[ed] directly" from the infringement.  *Cox II*, 93 F.4th at 232.

 The allegations here are not comparable.  The Fourth Circuit recently rejected an

identical claim against Cox, observing that the Labels "offered no legally adequate theory to

establish the required causal connection between subscribers' copyright infringement and

increased revenue to Cox."  *Id.* at 233.  That is because the "payment of monthly fees for internet

service, even by repeat infringers, [is] not a financial benefit flowing directly from *the copyright*

*infringement itself*."  *Id.* at 232.  True, ISPs "profit[] directly from the sale of internet access,"

including to people who allegedly use the internet in part for music piracy.  *Id.*  But such profits

– tied to the broader service in general, not to any infringing activity on the service – do not

count as "profits directly from the *acts of infringement*."  *Id.*; *see UMG Recordings, Inc. v. Bright*

*House Networks, LLC*, 2020 WL 3957675, at *3-7 (M.D. Fla. 2020) (dismissing the Labels'

identical vicarious-liability claim on the pleadings); *Grande*, 2018 WL 1096871, at *10 (same).

 The same is true here.  When someone uses a subscriber's internet connection to share

music via BitTorrent, it generates no revenue for Verizon.  Verizon instead charges subscribers

flat monthly fees pegged to their chosen download speeds, which remain the same no matter

what a given subscriber does online.  Compl. ¶¶ 57, 65, 81.  Courts have long refused to base

vicarious liability on such recurring fees.  *See Deutsch v. Arnold*, 98 F.2d 686, 688 (2d Cir. 1938)

(no liability for "landlord" charging rent to infringing "tenant"); *White v. DistroKid*, – F. Supp.

3d –, 2024 WL 3195471, at *8 (S.D.N.Y. 2024) (rejecting argument that "payment of a monthly

access fee is sufficient by itself to meet the causation requirement").  While Verizon, like any

business, surely has a "financial interest in retaining subscriptions" generally, that does "not give it a financial interest in its subscribers' myriad online activities." *Cox II*, 93 F.4th at 232.

The Labels proffer two theories of financial benefit, but neither is viable. *First*, they allege that Verizon's "permissive stance" toward infringement "acted as a draw to attract and retain new and existing customers." Compl. ¶ 64. The complaint offers no plausible basis for that inference. Verizon's subscribers "need the internet for countless reasons, whether or not they can infringe." *Cox II*, 93 F.4th at 232. So it is implausible that "infringing subscribers" bought internet access "because it enabled them to infringe." *Id.* The Labels have also sued nearly every other large ISP on this very theory. They therefore cannot "suggest that customers chose [Verizon's] internet service, as opposed to a competitor's," due to Verizon's "lenient response to infringement." *Cox II*, 93 F.4th at 232; *see Bright House*, 2020 WL 3957675, at *5 (rejecting same argument); *Grande*, 2018 WL 1096871, at *10 (same).[14]

*Second*, the Labels allege that Verizon earns "more when subscribers need higher data speeds or plans, which repeat infringers often do." Compl. ¶ 81. The Fourth Circuit rejected that argument, too. Although Cox similarly charged "higher monthly fees for increased data allowances," such pricing did not "raise[] a reasonable inference that any Cox subscriber paid more for faster internet in order to engage in copyright infringement." *Cox II*, 93 F.4th at 233. After all, subscribers want faster speeds for many lawful reasons – like simultaneously watching high-definition movies, conducting video calls, playing video games, and streaming music from Spotify. Given such uses, Verizon's customers did not plausibly want higher speeds "because of

---

[14] Although some courts previously allowed these claims, *cf. Altice*, 2023 WL 3436089, at *2-8; *RCN II*, 2022 WL 6750322, at *9-10; *Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1074-79 (D. Colo. 2020), those decisions all predate the Fourth Circuit's ruling.

the opportunity to infringe." *Cox II*, 93 F.4th at 233; *see Bright House*, 2020 WL 3957675, at *5 (same conclusion because "[a]ll users presumably seek faster, more reliable internet service").

### B.    The Labels Do Not Allege Sufficient Control Of The Infringement

Nor do the Labels allege Verizon's "ability to supervise the infringing activity." *Gershwin*, 443 F.2d at 1162. This element requires the defendant to "retain[ ] the ultimate right of supervision over the conduct" of the primary infringer. *Shapiro*, 316 F.2d at 308. The department store in *Shapiro*, for instance, signed "licensing agreements" with the infringing concessionaire, giving the store "unreviewable discretion" to police compliance with the store's "rules and regulations." *Id.* at 306. The concert organizer in *Gershwin*, for its part, engaged in "pervasive participation in the formation and direction" of the infringing concerts, at which the performers "depended upon [the organizer] for direction." 443 F.2d at 1163.

The Labels allege nothing similar. As an ISP, Verizon does not (indeed, cannot) monitor or supervise what its subscribers do online. *See Costar*, 373 F.3d at 551 ("the ISP provides a system that automatically transmits users' material but is itself totally indifferent to the material's content"); *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) (ISP "is an intermediary and normally is indifferent to the content of what it transmits"). For peer-to-peer piracy, Compl. ¶¶ 67-70, the pirated songs also reside on the infringers' computers – not "the ISP's servers" – and merely pass through Verizon's network on their way to other users, *RIAA*, 351 F.3d at 1235. So unlike a streaming website like YouTube that may host infringing content on its own servers, "Verizon can not remove or disable [any] user's access to infringing material," because as a mere conduit "Verizon does not control the content on [infringers'] computers." *Id.* at 1235.

The Labels still claim Verizon could have controlled the infringement by "suspend[ing] or terminat[ing] a subscriber's Internet access." Compl. ¶ 79. But an ability to expel someone from the internet is not an "ability to supervise the infringing activity." *Gershwin*, 443 F.2d at

1162.  Many innocent parties have the "literal power to stop or limit" an infringer from sharing music – including a power company, landlord, or operating-software provider.  *Visa*, 494 F.3d at 806.  Verizon is no different.  Being able to deprive an infringer of a basic service like the internet is not "sufficient control over the actual infringing activity for vicarious liability."  *Id.*; *see Concord Music Grp., Inc. v. X Corp.*, 2024 WL 945325, at *9 (M.D. Tenn. 2024) (control "means something more than simply the right to refuse to distribute one's product").

Traditional agency-law principles confirm the point.  Vicarious infringement rests on "agency principles of respondeat superior," *Cox II*, 93 F.4th at 230 (cleaned up), and reflects the same agency concepts "imposed in virtually all areas of the law," *Sony*, 464 U.S. at 435.  Yet Verizon's relationship with its internet subscribers does not even resemble that of traditional principal-agent.  In the classic case, an agency relationship arises from "an actual right of control," such as that exerted by an "employer" or a "controlling business owner."  *Concord*, 2024 WL 945325, at *9.  This case is different.  Unlike with an "employer/employee or principal/agent," Verizon lacks the power to "oversee" what subscribers do online and certainly has no "editorial control" over what files they share.  *Id.*  Without a "right to control the day-to-day" activity of its subscribers, Verizon's role lacks a "critical feature" of a traditional agency relationship.  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 277 (2d Cir. 2013).  Vicarious liability is thus improper.  *See Concord,* 2024 WL 945325*,* at *9-10 (similar for Twitter).

## CONCLUSION

The Court should dismiss the complaint with prejudice.

Date:  September 5, 2024

Respectfully submitted,

/s/ *Joshua D. Branson*

Joshua D. Branson (admitted *pro hac vice*)
Scott H. Angstreich (admitted *pro hac vice*)
Minsuk Han (SDNY Bar No. 5340757)
Ashle J. Holman (admitted *pro hac vice*)
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
sangstreich@kellogghansen.com
mhan@kellogghansen.com
aholman@kellogghansen.com

*Counsel for Verizon*