**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMG RECORDINGS, INC., et al. | |
| Plaintiffs, | Case No.  24-cv-05285 (MMG) |
| v. | |
| VERIZON COMMUNICATIONS INC., et al. | Hon. Margaret M. Garnett |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO VERIZON'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

LEGAL STANDARD ..................................................................................................... 4

ARGUMENT ................................................................................................................. 5

I.   THE COMPLAINT ADEQUATELY ALLEGES CONTRIBUTORY LIABILITY ............................... 5

   A.   Plaintiffs' allegations of knowledge and material contribution are ample. ................... 5

      1.   Verizon's receipt of infringement notices identifying specific subscribers repeatedly infringing Plaintiffs' works satisfies the knowledge requirement. ..................................... 5

      2.   Verizon's continued provision of internet service to specific subscribers known to repeatedly infringe satisfies contributory liability's material contribution requirement. ... 7

   B.   Verizon's continued provision of internet service to known repeat infringers satisfies the *Sony* and *Grokster* standards for contributory infringement. ............................................ 8

   C.   Verizon's sale of internet access to known repeat infringers is active conduct ............ 10

   D.   The Supreme Court's *Twitter v. Taamneh* decision does not exonerate Verizon ......... 12

      1.   *Twitter* concerns a terrorism statute and is irrelevant to copyright law. .................. 12

      2.   The missing nexus in *Twitter* between the defendant's assistance and the unlawful, underlying act is "quite direct" here. ............................................................................. 13

      3.   Verizon's interpretation of *Twitter* would upend the DMCA's carefully calibrated statutory scheme by rendering its safe harbors irrelevant. .................................................. 14

      4.   Verizon's hypothetical parade of horribles is bunk. ................................................ 15

      5.   *Twitter* does not upend the myriad decisions unanimously sustaining copyright plaintiffs' contributory infringement claims against ISPs. ................................................. 16

II.  THE COMPLAINT STATES A CLAIM FOR VICARIOUS INFRINGEMENT ................................. 18

   A.   Verizon receives a direct financial benefit from its subscribers' infringement using the Verizon network ........................................................................................................... 18

      1.   The Fourth Circuit's financial benefit analysis in *Cox* conflicts with established Second Circuit law—and the law in most other Circuits. ................................................. 20

2.    Even under *Cox*, Plaintiffs' claim establishes a direct financial benefit................... 23

B.    Verizon has the right and ability to control the infringement on its network. .............. 24

CONCLUSION.......................................................................................................................... 25

# TABLE OF AUTHORITES

## CASES

*A&E Television Networks, LLC v. Big Fish Entm't, LLC,*
2023 WL 4053871 (S.D.N.Y. June 16, 2023) .......................................................................... 5

*A&M Recs., Inc. v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. 2001) ............................................................................................ 6, 24

*Arista Recs. LLC v. Usenet.com, Inc.,*
633 F. Supp. 2d 124 (S.D.N.Y. 2009) ............................................................................. 8, 10, 24

*Arista Recs., LLC v. Doe 3,*
604 F.3d 110 (2d Cir. 2010) .................................................................................................... 5

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................................ 5, 23

*BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.,*
2023 WL 3436089 (E.D. Tex. May 12, 2023) ............................................................... passim

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.,*
149 F. Supp. 3d 634 (E.D. Va. 2015) .................................................................................... 25

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.,* .................................................................
199 F. Supp. 3d 958 (E.D. Va. 2016) ..................................................................................... 7

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.,*
881 F.3d 293 (4th Cir. 2018) ................................................................................... 6, 7, 9, 10

*Bodyguard Prods., Inv. v. RCN Telecom Servs., LLC,*
2022 WL 6750322 (D.N.J. Oct. 11, 2022) ............................................................................ 20

*Capitol Recs., LLC v. Escape Media Grp., Inc.,*
2014 WL 12698683 (S.D.N.Y. May 28, 2014) ...................................................................... 6

*Capitol Recs., LLC v. ReDigi Inc.,*
934 F. Supp. 2d 640 (S.D.N.Y. 2013) .................................................................................... 6

*Cobbler Nevada, LLC v. Gonzales,*
901 F.3d 1142 (9th Cir. 2018) .............................................................................................. 11

*Concord Music Grp., Inc. v. X Corp.,*
  2024 WL 945325 (M.D. Tenn. Mar. 5, 2024) .......................................................... 24

*Dallas Buyers Club, LLC v. Doughty,*
  2016 WL 1690090 (D. Or. Apr. 27, 2016) .............................................................. 11

*Dish Network LLC v. Datacamp Ltd.,*
  2023 WL 4549528 (N.D. Ill. July 14, 2023) .......................................................... 24

*Eight Mile Style LLC v. Spotify USA Inc.,*
  535 F. Supp. 3d 738 (M.D. Tenn. 2021) ................................................................. 9

*Ellison v. Robertson,*
  357 F.3d 1072 (9th Cir. 2004) ............................................................................. 22

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC,*
  844 F.3d 79 (2d Cir. 2016) ........................................................................... passim

*Flava Works Inc. v. Gunter,*
  689 F.3d 754 (7th Cir. 2012) .............................................................................. 12

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
  76 F.3d 259 (9th Cir. 1996) ............................................................................. 8, 21

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,*
  443 F.2d 1159, 1162 (2d Cir. 1971) ................................................................... 5, 8

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983) ....................................................................... 12, 17

*Herbert v. Shanley Co.,*
  242 U.S. 591 (1917) .......................................................................................... 22

*In re Aimster Copyright Litig.,*
  334 F.3d 643 (7th Cir. 2003) ............................................................................... 6

*In re Frontier Commc'ns Corp.,*
  658 B.R. 277 (Bankr. S.D.N.Y. 2024) ................................................... 14, 16, 17, 25

*Joe Hand Promotions, Inc. v. Griffith,*
  2023 WL 4752375 (E.D. Tenn. July 25, 2023) ....................................................... 22

*Kelly-Brown v. Winfrey,*
  717 F.3d 295 (2d Cir. 2013) ................................................................................. 5

*Leonard v. Stemtech Int'l Inc.*,
834 F.3d 376 (3d Cir. 2016)....................................................................... 22

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005).......................................................................... passim

*Perfect 10, Inc. v. Visa Int'l Servs. Ass'n*,
494 F.3d 788 (9th Cir. 2007) ..................................................................... 24

*Polygram Int'l Publ'g, Inc. v. Nevada/Tig, Inc.*,
855 F. Supp. 1314 (D. Mass. 1994)............................................................ 22

*Rams v. Def Jam Recordings, Inc.*,
202 F. Supp. 3d 376 (S.D.N.Y. 2016)......................................................... 24

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
316 F.2d 304 (2d Cir. 1963)..................................................... 18, 20, 21, 25

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984).......................................................................... passim

*Sony Music Entm't v. Cox Commc'ns, Inc.*,
464 F. Supp. 3d 795 (E.D. Va. 2020) ........................................................... 7

*Sony Music Entm't v. Cox Commc'ns, Inc.*,
93 F.4th 222 (4th Cir. 2024) ............................................................... passim

*Spanski Enters. v. Telewizja Polska, S.A.*,
883 F.3d 904 (D.C. Cir. 2018) ................................................................... 14

*Take-Two Interactive Software, Inc. v. Zipperer*,
2018 WL 4347796 (S.D.N.Y. Aug. 16, 2018) ............................................... 5

*Twitter v. Taamneh*,
598 U.S. 471 (2023).......................................................................... passim

*UMG Recordings, Inc. v. Grande Commc'ns Networks LLC*,
2018 WL 1096871 (W.D. Tex. Feb. 28, 2018).......................................... 24, 25

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
__ F.4th __, 2024 WL 4449684 (5th Cir. Oct. 9, 2024) ............................... passim

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC,*
    384 F. Supp. 3d 743 (W.D. Tex. 2019 ....................................................... 6, 7, 11, 12

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC,*
    2020 WL 5204067, at \*8 (D.N.J. Aug. 31, 2020) .................................... 6, 11, 12, 25

*Warner Recs. Inc. v. Charter Commc'ns, Inc.,*
    454 F. Supp. 3d 1069 (D. Colo. 2020) ...................................................................... 20

*Warner Recs., Inc. v. Altice USA, Inc.,*
    2024 WL 4341933, at \*3 (E.D. Tex. Sept. 12, 2024) ..................................... 13, 16, 18

*White v. DistroKid,*
    2024 WL 3195471 (S.D.N.Y. June 24, 2024) .......................................................... 24

**STATUTES**

17 U.S.C. § 512 ................................................................................................... 4, 14, 16

18 U.S.C. § 2333 ....................................................................................................... 12, 13

## INTRODUCTION

Verizon asks the Court to discard decades of well-established copyright law to concoct a new rule that an internet service provider ("ISP") cannot be held liable for copyright infringement on its network, even if the ISP knew of the infringement, contributed to it, and had the ability to stop it, but chose to do nothing because the ISP was profiting from the infringement.  If successful, Verizon's Motion would not only trample longstanding decisions from every level of the judiciary, including the Supreme Court, but also undermine the balance Congress struck between the interests of content owners and ISPs in the Digital Millennium Copyright Act ("DMCA").

Tellingly, courts in *every* analogous case have ruled that similarly pled contributory infringement claims against defendant ISPs should proceed, denying motions to dismiss, motions for summary judgment, post-trial motions, and appeals seeking to undo jury verdicts holding ISPs liable.  In those rulings, every court to consider the question has confirmed that the Supreme Court's holdings in *Sony* and *Grokster* are fully consistent with imposing secondary liability on an ISP, like Verizon, that chooses to continue to provide its high-speed internet service to subscribers that it knows repeatedly use that very service to infringe.[1]

That was true before the Supreme Court's decision in *Twitter v. Taamneh*, 598 U.S. 471 (2023), and continues to be true in the several decisions since *Twitter* that have sustained plaintiffs' similar claims and found that *Twitter* does not alter prior case law on secondary copyright infringement for ISPs.  Just last week, the Fifth Circuit reached that conclusion, rejecting the exact arguments Verizon asserts here, in a comprehensive decision affirming an ISP's liability for contributory infringement.  *See UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, __

---

[1] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*"); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ("*Grokster*").

F.4th __, 2024 WL 4449684, at *6-16, (5th Cir. Oct. 9, 2024) ("*Grande III*"). The Fourth Circuit, the Chief Judge of the U.S. Bankruptcy Court for the Southern District of New York, and a district court in Texas have ruled the same.

These rulings are no surprise as *Twitter* is not a copyright case. It is a case about a terrorism statute that makes no mention of copyright law at all. Contrary to Verizon's argument, the Supreme Court in *Twitter* did not silently upend decades of jurisprudence, including its own, establishing the parameters of secondary liability for copyright infringement. To hold otherwise would require this Court to conclude that the Supreme Court chose to completely displace, without comment, its prior holdings as well as the DMCA safe harbors that have regulated the relationship between copyright owners and ISPs for decades.

This is not at all a case about passive inaction by Verizon, as its Motion insists. This case is about an ISP that knew that specific subscribers were using its service to repeatedly infringe specific copyrighted works and affirmatively chose to continue to provide those subscribers with the very high-speed internet service they needed to continue infringing, all in exchange for substantial monthly fees. Every court to consider such conduct has held that an ISP can be liable in such circumstances. The Motion should be denied in full.[2]

## BACKGROUND

Plaintiffs are several of the world's largest record companies; they produce, manufacture, distribute, sell, and license commercial sound recordings. Compl. ¶¶ 3, 16. Plaintiffs own or

---

[2] Throughout its Motion, Verizon seeks to distract from the sufficiency of the Complaint—the *only* issue for the Court to decide—by arguing facts outside the pleading and presenting a distorted counter-narrative of the recording industry's longstanding efforts to address peer-to-peer ("P2P") infringement. Verizon's arguments are wrong in every respect and the Court should pay no heed to Verizon's attempt to distract from Plaintiffs' allegations with rhetoric and press reports, let alone take judicial notice of any of them, as Verizon seeks. *See* Mot. 3, n.1.

control the copyrights or exclusive rights in millions of sound recordings, including the sound recordings identified in Exhibit A to the Complaint. *Id.* ¶ 51 & Ex. A. The sound recordings in this case span a broad range of distinguished artists, including The Rolling Stones, Ariana Grande, Bob Dylan, Bruno Mars, Elvis Presley, Dua Lipa, and Drake. *Id.* Ex. A.

Verizon is one of the largest ISPs in the U.S., with tens of millions of subscribers across the country. Compl. ¶¶ 1, 56. It provides subscribers high-speed internet service in exchange for monthly subscription fees. *Id.* ¶¶ 57, 65. Many of Verizon's subscribers use Verizon's service to infringe copyrights, including on a P2P network called BitTorrent.[3] *Id.* ¶¶ 67-69. Critically, BitTorrent users operate anonymously, and copyright owners cannot identify them by their names or addresses; the only information available is their IP addresses. *Id.* ¶ 70; *Grande III*, 2024 WL 4449684, at *1. "Only the ISPs operating those networks possess the records necessary to match specific IP addresses to specific internet users." *Id.*; *see also* Compl. ¶¶ 70, 76. Accordingly, when copyright owners detect that their works are being infringed on BitTorrent, many of them send infringement notices to the relevant ISPs so the ISPs can identify the infringing subscribers and take appropriate action. *Id.* ¶¶ 73-74, 80; *Grande III*, 2024 WL 4449684, at *2.

Verizon has received millions of infringement notices from copyright owners. Compl. ¶ 64. Plaintiffs alone sent Verizon over 340,000 notices (the "Notices"). *Id.* ¶ 69. Each Notice detailed a specific instance of a Verizon subscriber using Verizon's service to unlawfully distribute and copy Plaintiffs' copyrighted works on BitTorrent. *Id.* ¶¶ 69, 74. The Notices provided Verizon all the information it needed to know which subscribers were infringing and the specific acts of

---

[3] P2P is a term used to refer to a type of network of users, each a "peer," whereby each peer connects directly to other peers to download or distribute files, rather than all network users retrieving files from one centralized server. Compl. ¶ 67.

infringement.  The Notices identified the unique IP address Verizon assigned to the infringing subscriber, the date and time the infringing activity occurred, a unique hash value identifying the infringing file containing Plaintiffs' copyrighted works, and more.  *Id.* ¶¶ 75, 76.

Yet rather than use this information to address the mass infringement on its network, Verizon made the conscious decision to continue to provide its services to subscribers it knew were using those services to violate Plaintiffs' rights, as though it were above the law.

Verizon had both the legal right and the practical ability to limit the infringement occurring on its network.  Verizon's "Copyright Infringement/Repeat Infringer Policy" purports to prohibit subscribers from using "Verizon's systems or servers in any manner that constitutes an infringement of third party intellectual property rights, under US copyright law."  *Id.* ¶ 60.  It further states that "it is Verizon's policy to terminate the account of repeat copyright infringers in appropriate circumstances."  *Id.*  Verizon's "Acceptable Use Policy" likewise reiterates that violations of "any third party's copyright" is conduct "which may lead to termination of [a subscriber's] Service."  *Id.*  However, rather than terminate repeat infringing subscribers, Verizon consciously chose to continue to sell them the internet service essential to their continued infringement so that Verizon could continue collecting subscriber fees.  *Id.* ¶ 83.[4]

## LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *A&E Television*

---

[4] Verizon argues that the internet is indispensable and that it cannot be the case that an ISP should have to terminate repeat-infringing subscribers.  Not only does the law require termination in appropriate circumstances for an ISP to obtain the DMCA safe harbor, 17 U.S.C. § 512(i)(1)(A), but discovery will show, as it has in prior cases, *e.g.*, *Grande III*, 2024 WL 4449684, at *4, that Verizon terminates *thousands* of subscribers every month who fail to pay their invoices, notwithstanding any purported indispensability of the internet to those subscribers.  Compl. ¶ 79.

4

*Networks, LLC v. Big Fish Entm't, LLC*, 2023 WL 4053871, at *5 (S.D.N.Y. June 16, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (cleaned up). "[T]he court accepts all factual allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor." *Take-Two Interactive Software, Inc. v. Zipperer*, 2018 WL 4347796, at *6 (S.D.N.Y. Aug. 16, 2018) (citing *Kelly-Brown v. Winfrey*, 717 F.3d 295, 304 (2d Cir. 2013)).

## ARGUMENT

### I.  The Complaint Adequately Alleges Contributory Liability

The standard for contributory copyright liability is well-established in the Second Circuit and elsewhere: "A contributory infringer is 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'"  *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99-100 (2d Cir. 2016) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).

Allegations of contributory infringement substantively identical to Plaintiffs' have been upheld at least ten times by courts across the country.  *See* § I.A.1, *infra*.  Indeed, no court has ever dismissed a contributory infringement claim against an ISP for this same conduct.  That should resolve this issue.  Nevertheless, Verizon advances three arguments why all the other courts to consider this issue were wrong.  All are meritless, and the Court should reject them.

### A.  Plaintiffs' allegations of knowledge and material contribution are ample.

> *1.  Verizon's receipt of infringement notices identifying specific subscribers repeatedly infringing Plaintiffs' works satisfies the knowledge requirement.*

In the Second Circuit, "contributory infringement liability is imposed on persons who 'know or have reason to know' of the direct infringement."  *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir.

2001)) ("*Napster*").  "In weighing the knowledge requirement, courts consider evidence of actual and constructive knowledge, including cease-and-desist letters…."  *Capitol Recs., LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 658 (S.D.N.Y. 2013), *aff'd*, 910 F.3d 649 (2d Cir. 2018).  "Willful blindness is knowledge, in copyright law … as it is in the law generally."  *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 308 (4th Cir. 2018) ("*BMG*") (quoting *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003).

"[M]ultiple courts have determined that allegations of knowledge of infringement based on infringement notices sent to ISPs were sufficient to support a contributory infringement claim."  *BMG Rights Mgmt. (US) LLC v. Altice USA, Inc.*, 2023 WL 3436089, at *11 (E.D. Tex. May 12, 2023) ("*Altice I*") (citing cases and denying motion to dismiss); *see also UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *8 (D.N.J. Aug. 31, 2020) (holding allegations that ISP received millions of infringement notices adequately alleged knowledge element of contributory liability); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 768 (W.D. Tex. 2019 ("*Grande II*") (denying ISP's motion for summary judgment on contributory infringement where it received "over a million copyright infringement notices" and "specifically tracked users by the number of notices it received about them"), *aff'd in relevant part*, *Grande III*, 2024 WL 4449684, at *8; *Capitol Recs., LLC v. Escape Media Grp., Inc.*, 2014 WL 12698683, at *23 (S.D.N.Y. May 28, 2014), *report and recommendation adopted*, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) (holding the evidence, including DMCA notices, demonstrated ISP's knowledge of infringement for contributory liability).

Courts around the country have consistently held that allegations like Plaintiffs' against an ISP sufficiently plead a contributory infringement claim.  In a materially identical case, the Fourth Circuit held that contributory liability "requires a defendant to have specific enough knowledge of

infringement that the defendant could *do* something about it" and concluded that an ISP's knowledge that a subscriber repeatedly infringed gives rise to a presumption of knowledge that they will infringe again. *BMG*, 881 F.3d at 307–08, 311–12 (emphasis original).

The Complaint alleges that "Plaintiffs' infringement notices provided Verizon with knowledge of clear and unambiguous infringing activity by Verizon subscribers," that "the infringement notices sent to Verizon pointed to specific subscribers who were flagrant and serial infringers" and that, "[o]nce Verizon received Plaintiffs' (and other rightsholders') infringement notices regarding a subscriber with a particular IP address, Verizon knew that its network was being used for unlawful purposes . . . ." Compl. ¶¶ 77–78, 82. As every court to address the issue has held, those allegations legally suffice to plead knowledge at this stage.

> ### 2. *Verizon's continued provision of internet service to specific subscribers known to repeatedly infringe satisfies contributory liability's material contribution requirement.*

"There can be no question that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that [an ISP] had the means to withhold that assistance upon learning of specific infringing activity." *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 979 (E.D. Va. 2016), *aff'd in part, rev'd on other grounds*, 881 F.3d 293 (4th Cir. 2018); *see also Grande II*, 384 F. Supp. 3d at 768 ("[I]t is beyond debate that [an ISP's] continuing provision of internet services to customers who engage in repeated copyright infringement substantially facilitates access to and the distribution of infringing materials."); *Sony Music Entm't v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 816 (E.D. Va. 2020) (holding that "a reasonable jury could find that Cox substantially assisted widespread infringement with actual knowledge of the conduct on specific subscribers' accounts" because "[d]efendants' high-speed internet services were necessary to the infringing actions in this case . . . [and] Cox was

indispensable to each instance of P2P infringement on its network."), *aff'd in relevant part, rev'd in part on other grounds*, 93 F.4th 222 (4th Cir. 2024).

These holdings apply the widely accepted principle that material contribution is "met where a defendant provides the 'site and facilities' … for infringing activity."  *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 155 (S.D.N.Y. 2009) (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996)).  Verizon's high-speed internet service was integral to the infringement and providing that tool to its subscribers for use to infringe Plaintiffs' copyrighted works satisfies this standard.  *See* Compl. ¶ 83.  Accordingly, no court has held that allegations against an ISP like those alleged here fail to sufficiently plead material contribution.

**B.  Verizon's continued provision of internet service to known repeat infringers satisfies the *Sony* and *Grokster* standards for contributory infringement.**

In its first attempt to overcome the authority contrary to its position, Verizon claims the Supreme Court's holdings in *Sony* and *Grokster* imposed a culpable intent requirement on claims of contributory infringement.  Mot. 8-10.  Verizon misreads both cases, as many of the decisions addressing the viability of contributory infringement claims against ISPs make clear.

*Grokster* did not introduce a new culpable intent requirement; it established inducement as a separate basis for secondary liability and left material contribution law unchanged.  Accordingly, *Grokster* did not reject other theories of contributory liability, such as material contribution, or add an intent requirement to them.  *See Grande III*, 2024 WL 4449684, at *11 ("*Grokster* endorsed the broader common-law theories of contributory liability articulated in *Gershwin* and other authorities; it didn't constrict them."); *Altice I*, 2023 WL 3436089, at *12 ("the *Grokster* Court was clear that liability for contributory infringement must still [be] analyzed by applying the 'rules of fault-based liability derived from the common law'." (quoting *Grokster*, 545 U.S. at 934–35)).

Ignoring this context, Verizon premises its argument on isolated references in *Grokster* to "affirmative steps taken to foster infringement," and "culpable expression and conduct."  These statements, read in light of *Grokster*'s clear instruction to maintain the existing common law framework, simply describe a sufficient basis for inducement-based liability, not a requirement for all forms of contributory liability.  *See Grande III*, 2024 WL 4449684, at *10 (observing that *Grokster* "expanded the doctrine of contributory infringement" to include inducement and did not address material contribution).  Thus, *Grokster*'s recognition of the inducement theory "should not be taken as writing out of the law liability based on material contribution."  *Altice I*, 2023 WL 3436089, at *12 (quotation omitted); *see also Eight Mile Style LLC v. Spotify USA Inc.*, 535 F. Supp. 3d 738, 746-47 (M.D. Tenn. 2021) (recognizing "the Supreme Court did not intend *Grokster* to be the holistic rewriting of caselaw that [defendant] suggests").

Far from absolving Verizon, *Sony* and *Grokster* support holding Verizon contributorily liable.  Every court to consider this issue has concluded that "the fact that [the ISP's] technology can be substantially employed for a noninfringing use does not immunize it from liability for contributory copyright infringement."  *BMG*, 881 F.3d at 306–07; *Sony Music Entm't v. Cox Commc'ns, Inc.*, 93 F.4th 222, 236 (4th Cir. 2024) ("*Cox*") (rejecting argument that ISP "cannot be liable for materially contributing to copyright infringement because the internet service it provides is capable of substantial lawful use and not designed to promote infringement"); *Altice I*, 2023 WL 3436089, at *12-13 (relying on *BMG* to deny ISP's motion to dismiss secondary infringement claims and rejecting ISP's reliance on the substantial noninfringing uses doctrine).

These courts have recognized that ISPs like Verizon crucially differ from the defendant in *Sony*, which manufactured a good and whose relationship with its customers ended at the point of

sale.  By contrast, ISPs have an ongoing relationship with their customers who use their services

to infringe.  As the Fifth Circuit just put it,

> Plaintiffs' theory of liability in this case [is based on the ISP's] knowledge of its
> subscribers' actual infringements based on its ongoing relationship with those
> subscribers.  Because *Sony* and *Grokster* expressly addressed records where such a
> continuing relationship did not exist, their holdings do not foreclose the theory of
> liability on which Plaintiffs here based their claim.

*Grande III,* 2024 WL 4449684, at *10 (citing *BMG*, 881 F.3d at 305-07).

This result follows naturally from the common law rule "that if a person knows that the

consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is

treated by the law as if he had in fact desired to produce the result."  *BMG*, 881 F.3d at 307

(quotation omitted).  Verizon was aware of its specific subscribers' infringing activity and yet it

continued to sell its service to those subscribers, so it can be presumed that Verizon's intent was

for the infringement to continue.  *Id* at 307-08.  Thus, Verizon's continued provision of internet

service to known repeat infringers establishes "actions directed to promoting infringement" under

*Grokster* and obviates application of *Sony*'s substantial noninfringing uses rule.  *See Usenet.com*,

633 F. Supp. 2d at 156 (holding *Sony*'s substantial noninfringing uses doctrine inapplicable and

granting summary judgment for plaintiffs where "there is no dispute that Defendants maintain an

ongoing relationship with their users").

### C.  Verizon's sale of internet access to known repeat infringers is active conduct.

Verizon argues that Plaintiffs' allegations encompass only "passive inaction," Mot. 11, and

that the "core fact alleged is that Verizon chose to ignore Plaintiffs' notices of infringement," *id.*

12, which is not intentional conduct.  This grossly misreads the Complaint and contradicts the case

law holding ISPs liable for this precise conduct.  Verizon's continued sale of internet service to

specific subscribers it knows use that service to repeatedly infringe *is* an affirmative act.  *See*

10

*Grande III*, 2024 WL 4449684, at *12 (holding that continuing to provide high-speed internet access to subscribers after learning that they were "repeatedly using those tools to infringe" is not "mere passive nonfeasance").  Verizon actively provides the bandwidth, modem and customer service to each subscriber, actively issues monthly bills, actively processes monthly payments, actively processes (some) infringement notices, and deliberately and actively chooses to continue providing those services notwithstanding Plaintiffs' notices. *See* Compl. ¶¶ 81, 91.  As the *Grande* trial court held when confronted with exactly the same argument Verizon advances here, "[t]he specific act in question here is the continued provision of internet services to customers.  Thus this is not a case of mere refusal to act.  [The ISP] acted affirmatively by continuing to sell internet services and continuing to provide internet access to infringing customers."  *Grande II*, 384 F. Supp. at 767; *see also RCN*, 2020 WL 5204067, at *9 (quoting *Grande II*).  Indeed, discovery will likely show that Verizon not only continued to provide high-speed service but was upselling customers for increased bandwidth and honing its network to accommodate the infringing usage.

As have other ISPs that have made this argument, Verizon cites to a series of inapposite cases in an effort to escape this law and logic.  Both *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018), and *Dallas Buyers Club, LLC v. Doughty*, 2016 WL 1690090 (D. Or. Apr. 27, 2016) involve claims against ISP *subscribers* (*i.e.*, not the ISPs themselves) who failed to prevent users with whom their connection was shared from infringing.  *Cobbler Nevada* involved a "failure to 'secure, police and protect the connection'" in circumstances where the direct infringer was never identified.  901 F.3d at 1145 n.1, 1148.  So too *Dallas Buyers Club*.  2016 WL 1690090, at *6, *9.  But failing to secure an internet connection with mere generalized knowledge that infringement is happening is a far cry from affirmatively continuing to sell monthly internet access to specific subscribers that Verizon knows repeatedly use it to infringe, as other courts have

11

recognized in distinguishing these cases.  *See Grande III*, 2024 WL 4449684, at *15; *Grande II*, 384 F. Supp. at 767 n.6.; *RCN*, 2020 WL 5204067, at *10 n.5.[5]

### D.  The Supreme Court's *Twitter v. Taamneh* decision does not exonerate Verizon.

Verizon's final attempt to escape contributory liability, where no other ISP has, is premised on the Supreme Court's recent decision in *Twitter*.  Mot. 14-16.  That decision is irrelevant here.

*1.*  Twitter *concerns a terrorism statute and is irrelevant to copyright law.*

In *Twitter*, the Supreme Court held that the family of an ISIS terrorism victim in Turkey failed to state a claim against Facebook, Google, and Twitter under the aiding and abetting provision of the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2). *Id.* at 507.  When Congress enacted JASTA, it pointed to common law aiding and abetting cases, in particular *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), to elucidate secondary liability standards under that statute.  *Twitter*, 598 U.S. at 485.  Notably, Congress did not point to secondary liability standards under the Copyright Act to interpret JASTA, though such standards had existed for decades.  *Grokster*, 545 U.S. at 930-31.

*Twitter* makes no mention at all of copyright law, and it would be highly irregular to presume that the Supreme Court intended to silently overrule decades of copyright law and congressional legislation in an unrelated case.  *See Grande III*, 2024 WL 4449684, at *11.  To that point, the only Justice to discuss *Twitter*'s application beyond JASTA cautioned *against* the type of overreaching Verizon advances here: "General principles are not, however, universal.  The

---

[5] Verizon's reliance on *Flava Works Inc. v. Gunter* is similarly misplaced. 689 F.3d 754 (7th Cir. 2012).  There, defendant's website acted as a video aggregator, allowing users to bookmark and watch videos hosted by third parties.  *Id.* at 756-57.  Given this and the lack of evidence of direct infringement at the preliminary injunction stage, the court reasoned the notices were therefore "irrelevant."  *Id.* at 758, 760, 762.  Here, by contrast, Plaintiffs' notices repeatedly identify which specific Verizon subscribers are infringing Plaintiffs' works using Verizon's internet service.

common-law propositions this Court identifies in interpreting § 2333(d)(2) do not necessarily translate to other contexts." *Twitter*, 598 U.S. at 507 (Jackson, concurring). Recognizing as much, all courts to date that have considered ISP secondary liability for copyright infringement after *Twitter* have rejected ISPs' arguments that *Twitter* altered copyright law. *See* § I.D.5, *infra*.

> ### 2. *The missing nexus in* Twitter *between the defendant's assistance and the unlawful, underlying act is "quite direct" here.*

To the extent *Twitter* is relevant at all, it supports the sufficiency of Plaintiffs' claim here. In evaluating aiding-and-abetting liability, *Twitter* emphasized the importance of the nexus between the defendant's conduct and the tort at issue, concluding that courts can more easily infer a defendant's "culpable assistance" to a tort when a "direct nexus" exists between the defendant's conduct and the tort itself. *Twitter*, 598 U.S. at 506. Crucially, the *Twitter* Court held that "the nexus between defendants and the Reina [terrorist] attack is far removed." *Id.* While the *Twitter* plaintiffs alleged that ISIS used the defendants' social-media platforms to recruit terrorists, raise funds, and spread propaganda, *id.* at 481, they did not, and could not, allege that ISIS used the defendants' social-media platforms to actually carry out or even plan the terrorist attack at issue. *Id.* at 498. The nexus was missing.

"In contrast to *Twitter*, the nexus between [Verizon's] conduct and the tort for which Plaintiffs seek redress is direct." *Grande III*, 2024 WL 4449684, at *12. The other courts asked to apply *Twitter* saw it the same. *See Warner Recs., Inc. v. Altice USA, Inc.*, 2024 WL 4341933, at *3 (E.D. Tex. Sept. 12, 2024) ("*Altice II*") (denying motion to dismiss based on same argument and holding, "[h]ere, nexus is quite direct, the service provided by Defendants is used to infringe Plaintiffs' copyrights where the service provided in *Twitter* had little if anything to do with the commission of the attacks"), *report and recommendation adopted*, 2024 WL 4336731 (E.D. Tex.

Sept. 27, 2024); *In re Frontier Commc'ns Corp.*, 658 B.R. 277, 301 (Bankr. S.D.N.Y. 2024) (missing nexus in *Twitter* "is a far cry from the allegations here"). Verizon sells its subscribers high-speed internet access, which those subscribers then use to carry out their infringement. Indeed, the P2P infringement at issue would be impossible without Verizon's services, and Verizon knows those specific subscribers use its service to infringe.

Verizon argues *Twitter's* broad proclamation that the common law "traditionally does not view 'routine transactions' as culpable assistance," Mot. 15 (quoting *Twitter*, 598 U.S. at 491), should control here. But as the Fifth Circuit just held, "aiding-and-abetting liability" "does not map one-to-one onto contributory copyright infringement" and so these statements "cannot [] be read to uproot material-contribution liability." *Grande III*, 2024 WL 4449684, at *12 n.10.[6]

### 3. *Verizon's interpretation of* Twitter *would upend the DMCA's carefully calibrated statutory scheme by rendering its safe harbors irrelevant.*

Verizon's reading of *Twitter* effectively posits a categorical rule under which a service provider could never be held secondarily liable for wrongdoing on its network even when it knows specific subscribers are using the service for that purpose. Not so. By enacting the DMCA safe harbors, "Congress has already provided statutory protection against some of the[] potential ramifications" of online service providers' liability for copyright infringement occurring over their networks. *Spanski Enters. v. Telewizja Polska, S.A.*, 883 F.3d 904, 912 (D.C. Cir. 2018). The DMCA, including its safe harbors, shields ISPs from liability for copyright infringement occurring on their networks in certain circumstances. *See* 17 U.S.C. § 512. To benefit, an ISP needs to

---

[6] Verizon wrongly asserts that "the key is whether the service provider 'treated [the wrongdoer] any differently from anyone else.'" Mot. 15 (quoting *Twitter*, 598 U.S. at 500). Rather, the "key" in *Twitter* was the lack of nexus between the defendant's assistance and the underlying tort, as every court to consider the case agrees. The Supreme Court's reference to defendant's treatment of the tortfeasor was relevant only because of the lack of nexus in *Twitter*, contrary to here.

simply comply with the pertinent statutory conditions. Verizon has indicated it intends to invoke a Section 512 safe harbor in this case. Mot. 6.

That Congress saw the need to enact the DMCA safe harbors shows that it recognized that ISPs faced the threat of secondary liability under the common law and sought to limit that threat only in certain carefully prescribed circumstances. Congress deliberately chose not to "embark[] upon a wholesale clarification" of secondary liability law and decided "instead, to create a series of 'safe harbors,' for certain common activities of service providers." S. REP. NO. 105-190 (1998) at 19. Had Congress wanted to immunize all ISP activity, it could and would have done so.

Verizon's reading of *Twitter*, however, would upend Congress's carefully balanced statutory scheme by rendering the safe harbors and 25 years of the DMCA's operation superfluous, as no ISP would need to seek or comply with the safe harbors to avoid liability for infringement. That absurd result clearly is not what the Supreme Court contemplated in *Twitter*.

### 4. *Verizon's hypothetical parade of horribles is bunk.*

Verizon hypothesizes a parade of devastating consequences from Plaintiffs' legal theory, Mot. 16-17, but all are handily dealt with by proper application of common law principles as articulated in *Twitter*. 598 U.S. at 506. Through this lens, Verizon's musings about liability for power companies, colleges, landlords, and operating system providers all miss the mark. The nexus between all of these and the infringement at issue are far more attenuated than here. Verizon's provision of high-speed internet to known infringers is the very means by which those infringing subscribers copy and distribute Plaintiffs' copyrighted works. Infringers do not make infringing copies and distribute them via powerlines, higher learning classes, leases, or installing operating system software. For similar reasons, Verizon's concerns about cell service provider liability for drug deals, is misplaced. Mot. 17. One does not transfer illegal drugs through cell

service.  It is also worth noting that the "notices" in the cell service hypothetical—missing from the hypothetical as articulated in *Twitter*, 598 U.S. at 499—in Verizon's imagination come from a nosy neighbor, not an entity empowered by the law to bring claims relating to the tort, unlike here.

More importantly, Verizon's motion must challenge Plaintiffs' allegations, not imaginary edge case hypotheticals, and those allegations fall within the context of the DMCA.  Unlike Verizon's phantom defendants, the Copyright Act expressly recognizes that ISPs may face liability for copyright infringement and includes the DMCA safe harbor for transitory digital networks.  17 U.S.C. § 512(a).  All Verizon needed to do to avoid potential liability here was to comply with the safe harbor.  It did not, and there is nothing at all radical about holding Verizon accountable here, as numerous courts have done against other ISPs.

> 5. *Twitter does not upend the myriad decisions unanimously sustaining copyright plaintiffs' contributory infringement claims against ISPs.*

Verizon cites *seven* different "decisions [that] have accepted the Labels' contributory infringement claims against other large ISPs," Mot. 18 & n.12, and there are many more, cited *supra*.  It then argues that *Twitter* "now precludes their reasoning."  *Id*.  That is wrong, as the four courts to consider the issue post-*Twitter* have all rejected Verizon's position, and rightly so.  *See Grande III*, 2024 WL 4449684, at *11-12 (rejecting the application of *Twitter* and affirming ISP's liability for contributory infringement); *Cox*, 93 F.4th at 236-37 (affirming same liability finding and ignoring defendant ISP's letter briefing on *Twitter*); *Frontier*, 658 B.R. at 305 (denying motion to dismiss)*; Altice II*, 2024 WL 4341933, at *3 (same).

The Fifth Circuit's *Grande* decision rejected the application of *Twitter* for all of the reasons discussed above.  And as that decision noted, the Fourth Circuit issued its decision in *Cox* after and with awareness of the *Twitter* ruling and yet rejected the very arguments Verizon makes here.

*Grande III*, 2024 WL 4449684, at *14 ("Although the court ultimately didn't cite *Twitter* in its decision, it held that imposing contributory liability on ISPs on the facts at issue there (which closely resemble those in this case) comports with the traditional principles of aiding-and-abetting liability that *Twitter* addressed.") (citing *Cox*, 93 F.4th at 236).[7]

Verizon attacks the *Frontier* decision's treatment of *Twitter*, but the decision is correct and corroborated by all of the decisions that have followed. First, Verizon argues that the decision mistook *Twitter* as being "about secondary criminal liability." Mot. 19. But the *Frontier* court correctly observed that the Supreme Court in *Twitter* based its analysis of JASTA in part on the "ancient criminal law doctrine" of "aiding and abetting upon which *Halberstam* [*v. Welch*] rested." *Twitter*, 598 U.S. at 488. Second, Verizon claims that the *Frontier* court erred in distinguishing *Twitter* as addressing "terrorist acts." Mot. 19. The argument is confounding. Of course the court distinguished a case concerning secondary liability for terrorism under JASTA from contributory copyright infringement. It nevertheless correctly observed that, while *Twitter*, *Sony*, and *Grokster* "attach to the same conceptual core," *Twitter*'s analysis under JASTA did not "silently [rewrite] decades of common-law doctrine on secondary [copyright] liability." 658 B.R. at 288.

Finally, Verizon disputes *Frontier*'s finding of "a closer 'nexus' between the ISP and infringement than between Twitter and the ISIS attack." Mot. 20. Verizon says the measure of nexus should be the relationship between the defendant and the tortfeasor. *Id.* But *Twitter* repeatedly explained the relevant inquiry is the "nexus between the assistance and the tort." *Twitter*, 598 U.S. at 496; *see also id.* at 506 ("The focus must remain on assistance to the tort for

---

[7] The Fourth Circuit also rejected Cox's motion for rehearing on the basis that it erred in light of *Twitter*. *Sony Music Entm't v. Cox Commc'ns, Inc.*, 21-1168, ECF Nos. 95 (Petition for Rehearing En Banc) (4th Cir. Mar. 5, 2024) & 105 (Order Denying Rehearing) (4th Cir. Mar. 19, 2024).

which plaintiffs seek to impose liability."); *id.* at 503 ("[T]he question is whether defendants gave

substantial assistance to ISIS with respect to the Reina attack"); *Altice II*, 2024 WL 4341933, at

*3 (referring to nexus as "quite direct" between defendant's internet service and the infringement).

## II. The Complaint States a Claim for Vicarious Infringement

As the Second Circuit has long held, "[w]hen the right and ability to supervise coalesce

with an obvious and direct financial interest in the exploitation of copyrighted materials … the

purposes of copyright law may be best effectuated by the imposition of liability upon the

beneficiary of that exploitation." *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307

(2d Cir. 1963) (citation omitted); *see also Grokster*, 545 U.S. at 931 ("One … infringes vicariously

by profiting from direct infringement while declining to exercise a right to stop or limit it.") (citing

*id.*).  Plaintiffs have adequately alleged both prongs of their claim for vicarious liability.  While

Verizon relies heavily on the Fourth Circuit's recent decision reversing a finding of vicarious

liability against another ISP, that decision conflicts with established Second Circuit law and did

not, in all events, hold that Plaintiffs' allegations here were insufficient to state a claim.

### A.  Verizon receives a direct financial benefit from its subscribers' infringement using the Verizon network.

The Complaint properly pleads that Verizon has a direct financial interest in its subscribers'

infringing activity by alleging that the opportunity to infringe and Verizon's leniency on infringers

draws prospective customers to Verizon's services and allows Verizon to retain existing

customers, resulting in additional subscription fees to Verizon.

The landmark case on vicarious liability for infringing copyrighted music is *Shapiro,*

*Bernstein*, 316 F.2d 304.  There, the Second Circuit considered an infringement claim against a

department store based on its concessionaires' sale of unauthorized phonorecords to customers.

18

*Id*. at 306-07. The Court analogized the circumstances to the "legion" of cases "which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income." *Id.* at 307 (collecting cases).

The Court noted that, "Green had a most definite financial interest in the success of Jalen's concession" as a portion of "the sales price of every record sold by Jalen, whether 'bootleg' or legitimate, found its way—both literally and figuratively—into the coffers of the Green Company." *Id.* at 308. The Court thus found the total revenue generated—from both infringing and legitimate sales—relevant to the financial benefit analysis. Subsequent Second Circuit cases have affirmed this principle. *E.g.*, *EMI Christian Music*, 844 F.3d at 99 (holding, "[a]n increase in subscribers or customers due to copyright infringement qualifies as an 'obvious and direct financial interest,'" and that "an obvious and direct financial interest ... may be established where infringing material acts as a 'draw' to attract subscribers to a defendant's business, even if it is not the primary, or even a significant draw") (internal quotations omitted).

Measured against this standard, Plaintiffs plainly allege direct financial benefit:

- *First*, the Complaint alleges that "Verizon is paid monthly fees directly by repeat infringing subscribers." Compl. ¶ 81.

- *Second*, the Complaint alleges that, if Verizon had terminated repeat infringers, it would have lost revenue. *Id.* ¶ 9 ("By failing to terminate the accounts of specific recidivist infringers known to Verizon, Verizon obtained . . . improper revenue that it would not have received had it appropriately shut down those accounts."); ¶ 81 ("Verizon did not want to lose subscriber revenue by terminating accounts of infringing subscribers."); ¶¶ 65, 103.

- *Third*, the Complaint alleges that, if Verizon had "terminated or otherwise prevented its repeat infringer subscribers from using its service to infringe, or made it less attractive for such use, Verizon would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue." *Id.* ¶ 65; *see also* ¶¶ 9, 64, 81, 82, 103. This includes Verizon attracting new customers, which brings in new fees, which Verizon

19

would not have received if it employed stricter infringement measures.

- *Fourth*, the Complaint alleges that "For those account holders and subscribers who wanted to download files illegally at faster speeds … Verizon offered 'tiered' service plans in which . . . subscribers could pay more for a higher-tier plan which provides unlimited data and faster upload and download speeds." *Id.* ¶ 65.

Numerous courts have held that such allegations state a claim for vicarious liability in materially similar circumstances. *See Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1074-79 (D. Colo. 2020) (finding complaint against ISP properly pleaded direct financial benefit); *Altice I*, 2023 WL 3436089, at *2-8 (same); *Bodyguard Prods., Inv. v. RCN Telecom Servs., LLC*, 2022 WL 6750322 (D.N.J. Oct. 11, 2022) (same).

> 1. *The Fourth Circuit's financial benefit analysis in* Cox *conflicts with established Second Circuit law—and the law in most other Circuits.*

Verizon's motion relies extensively on the recent *Cox* decision from the Fourth Circuit, Mot. 21–24, but that opinion conflicts with governing Second Circuit law. The *Cox* court "demand[ed] proof that the defendant profits directly from the *acts of infringement* for which it is being held accountable." 93 F.4th at 232 (emphasis original). The court therefore found the evidence that "Cox repeatedly declined to terminate infringing subscribers' internet service in order to continue collecting their monthly fees" legally insufficient because, in the court's view, "Cox would receive the same monthly fees even if all of its subscribers stopped infringing." *Id.*

The Fourth Circuit's opinion is contrary to binding Second Circuit precedent. First, *Cox*'s demand that the defendant "profit directly from the *acts of infringement*" is contrary to *Shapiro*, *Bernstein* and *EMI Christian Music*, where, as explained above, the Court considered the revenue generated by the infringing enterprise as a whole relevant to the financial benefit analysis.

Second, the *Cox* court's analysis diverges sharply from Second Circuit law when compared to the facts of *EMI Christian Music*. In *EMI*, the defendants' MP3tunes service allowed users to

search for "free" music on the internet and store it in their digital lockers.  844 F.3d at 86.  The evidence showed some, but not all, of the music indexed using this feature "look[ed] to be mainly pirated music."  *Id.* at 87 (alteration in original).  Still, the Court found there was "ample evidence to support the jury's finding" of vicarious liability.  *Id.* at 99.  The Court pointed to the use of this search feature to draw users to MP3tunes, who could then be sold expanded digital locker storage.  *Id.*  Because the infringing material in the digital lockers did not count against the free storage limit, *id*. at 87, the profit was not "profit[] directly from the *acts of infringement*."  *Cox*, 93 F.4th at 232.  Under the Fourth's Circuit's analysis, the defendants would not have received a direct financial benefit because MP3Tunes would have received the same amount of revenue had its users simply stopped using the infringing search and storage feature.  *Cox*, 93 F.4th at 232.

Third, the *Cox* approach shifts the financial benefit analysis away from the defendant's incentive to tolerate infringement, contrary to Second Circuit law.  In *Shapiro, Bernstein*, the Court focused on the defendants' incentive to tolerate infringement, writing that "we might foresee the prospect—not wholly unreal—of large chain and department stores establishing 'dummy' concessions and shielding their own eyes from the possibility of copyright infringement, thus creating a buffer against liability while reaping the proceeds of infringement."  316 F.2d at 309.  Similarly, in *EMI Christian Music*, the Court relied on evidence not that MP3tunes users *actually* signed up for paid locker storage because of the availability of infringing music, but that the CEO *intended* that result as he "sought to use [the infringing search feature] to attract free users whom MP3tunes could thereafter 'upsell' to premium lockers."  844 F.3d at 99.

The *Cox* court's analysis also conflicts with the law of other circuits.  In *Fonovisa*, the Ninth Circuit held that a record company adequately pled a direct financial benefit from the sale of infringing materials at a "swap meet," despite that the swap meet proprietor received only a flat

fee for admissions, concession sales, and parking fees.  76 F.3d at 263-64.  The Ninth Circuit in *Ellison v. Robertson* found a lack of financial benefit because it found no evidence that "AOL attracted or retained subscriptions because of the infringement or lost subscriptions because" the ISP blocked infringement, 357 F.3d 1072, 1079 (9th Cir. 2004), which is the exact type of evidence the *Cox* court found legally insufficient, *Cox*, 93 F.4th at 232.  The Seventh Circuit similarly finds direct financial benefit where the owner of the establishment benefits from the broader operation in which infringement occurred, even if not "directly from the infringement that he encourages." *Aimster*, 334 F.3d at 654.  Finally, the Third Circuit found that a nutritional supplements company received a financial benefit from its distributors' infringement of stem cell photos, despite that there was no evidence that customers came to the distributors' websites to purchase or view the photos, nor that customers paid more because of the photos; rather, because the photos could have "lend[ed] legitimacy to the products … draw[ing] customers to buy the product, which would financially benefit [defendant]." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 389 (3d Cir. 2016).

The *Cox* decision is also contrary to Supreme Court precedent.  In *Herbert v. Shanley Co.*, 242 U.S. 591 (1917), the Court considered the profit element in the context of the 1909 Copyright Act, which granted copyright owners the right to perform musical compositions "publicly for profit."  *Id.* at 593.  The Court found even though defendants had only charged patrons for their meals, not to listen to music, "the purpose of employing [music] is profit, and that is enough," and indeed, that "[i]f music did not pay, it would be given up." *Id.* at 595.  So too here; if Verizon did not believe access to BitTorrent drew subscribers to its service, it would enforce its policies.[8]

---

[8] Courts continue to rely on *Herbert* when construing financial benefit under vicarious copyright liability. *See Joe Hand Promotions, Inc. v. Griffith*, 2023 WL 4752375, at *7 (E.D. Tenn. July 25, 2023); *Polygram Int'l Publ'g, Inc. v. Nevada/Tig, Inc.*, 855 F. Supp. 1314, 1330 (D. Mass. 1994).

2. *Even under* Cox*, Plaintiffs' claim establishes a direct financial benefit.*

Even if the Court applies the standard used by the *Cox* court, Plaintiffs adequately plead direct financial benefit. The *Cox* court held only that the evidence the plaintiffs presented at trial did not establish that customers were drawn to Cox's services by the opportunity to infringe. *Cox*, 93 F.4th at 232-33. *Cox* did not disturb the premise that where the opportunity to infringe draws customers to the defendant's services, the financial-interest prong is satisfied. *Id.* at 233 ("Sony has not identified any evidence that customers were attracted to Cox's internet service or paid higher monthly fees because of the opportunity to infringe Plaintiffs' copyrights.").[9]

While Verizon contests the facts underlying Plaintiffs' allegations, it cannot do so on a motion to dismiss. Those allegations must be accepted as true at this juncture. *Iqbal*, 556 U.S. at 678. The question for the Court is whether those allegations lead to a plausible inference of direct financial benefit. *Id.* Thus, Verizon's challenges to whether subscribers are drawn to its services by its lax enforcement and fast internet speeds for infringement, Mot. 23, cannot provide a basis to dismiss Plaintiffs' claim. Indeed, Verizon's advertisements that it offers "nearly matching download and upload speeds," Compl. ¶ 58, specifically entice infringing BitTorrent users as fast *upload* speeds are required for the faster distribution of Plaintiffs' copyrighted works, but not required for the most common legal uses of the internet (e.g., video streaming). *See Rams v. Def*

---

[9] Verizon argues that Plaintiffs must show that "customers chose [Verizon's] internet service, as opposed to a competitor's" to show draw, Mot. 23, quoting *Cox*, 93 F.4th at 232. *Cox* articulates the draw standard with and without reference to competitors. To the extent that *Cox* can be read to require that customers must be drawn to defendant in lieu of a competitor, that requirement is unsupported by the case law. For example, none of the "dance hall" cases required a showing that customers were drawn to infringing halls over non-infringing ones. And simply because other ISPs may attract P2P infringers doesn't mean Verizon's leniency doesn't also attract or retain subscribers who desire to use the service to infringe. Verizon's position also would lead to the absurd result that none of an industry full of infringing competitors could ever be vicariously liable.

*Jam Recordings, Inc.*, 202 F. Supp. 3d 376, 385 (S.D.N.Y. 2016) (finding use of infringing image tied to "marketability" of album sufficient to allege direct financial benefit).[10]

### B. Verizon has the right and ability to control the infringement on its network.

The second element of vicarious liability is that the defendant has "the right and ability to supervise" the infringing activity. *EMI Christian Music*, 844 F.3d at 99. Verizon has the right and ability to supervise its subscribers' repeated infringing activity because, as the Complaint (¶ 79) alleges, Verizon can terminate those subscribers' access to its service. "[T]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Usenet.com*, 633 F. Supp. 2d at 157 (quoting *Napster*, 239 F.3d at 1023); *see also Dish Network LLC v. Datacamp Ltd.*, 2023 WL 4549528, at *4 (N.D. Ill. July 14, 2023) ("When the defendant can terminate its users' access to the system to prevent infringement, the defendant has the ability to stop infringement.").[11]

---

[10] None of Verizon's other cases establish that dismissal is appropriate. Neither *White* nor *Grande I* involved allegations that users were drawn to defendants' platform, unlike Plaintiffs' allegations here. *White v. DistroKid*, 2024 WL 3195471, at *10 (S.D.N.Y. June 24, 2024) (mistakenly relying on *Cox* and finding "there are no allegations that users are drawn to and subscribe to DistroKid because it provides them with the ability to commit copyright infringement."); *UMG Recordings, Inc. v. Grande Commc'ns Networks LLC*, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) ("*Grande I*") ("There are no allegations that Grande's actions in failing to adequately police their infringing subscribers is a draw to subscribers to purchase its services, so that they can then use those services to infringe on UMG's (and others') copyrights."). *UMG Recordings Inc. v. Bright House Networks, LLC* contravenes the law in the Second Circuit, *EMI Christian Music*, 844 F.3d at 99, having held that Plaintiffs must show "the very success of the defendant's venture must depend on the infringing activity," 2020 WL 3957675, at *4 (M.D. Fla. July 8, 2020) (cleaned up).

[11] Verizon's cases to the contrary are simply not availing. While *Perfect 10, Inc. v. Visa Int'l Servs. Ass'n*, held that a payment processor did not have sufficient control over infringing websites, that was because Visa's withdrawal of financial services to those websites still left the websites— and their infringement—operational. 494 F.3d 788, 803 (9th Cir. 2007) (distinguishing *Napster*, where the Ninth Circuit held that "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise," *Napster*, 239 F.3d at 1023). *Concord Music Grp., Inc. v. X Corp.* followed the standard Verizon urges, but

Many courts in circumstances similar to those here have considered and rejected Verizon's contentions. In *Altice I*, the Eastern District of Texas held that the "termination theory of control is sufficient." 2023 WL 3436089, at *7. The court relied on several other courts that likewise rejected this argument. *See Grande I*, 2018 WL 1096871, at *10 ("Grande can stop or limit the infringing conduct by terminating its subscribers' internet access . . . This is clearly sufficient to state a claim on the first element of vicarious liability.") (citation omitted); *Charter*, 454 F. Supp. 3d at 1086 (same); *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 674-75 (E.D. Va. 2015) (same)); *see also RCN*, 2020 WL 5204067, at *11 (same).

Verizon seeks to apply a far stricter standard than courts have embraced, arguing that the right to terminate subscribers who infringe does not amount to a right to supervise or control because Verizon cannot "monitor … what its subscribers do online." Mot. 24. But, as the cases cited above establish, vicarious liability does not require that Verizon be able to "monitor" its subscribers in real time. "While the standard is clearly met in situations where the direct infringers look to the defendant for direction and the defendant is in a position to police the infringing conduct, such a tight leash is not *required* to establish liability." *Frontier*, 658 B.R. at 293 (cleaned up) (emphasis original). Indeed, when considering the "dance hall" cases, the Second Circuit observed that the dance hall was liable "whether or not the proprietor has knowledge of the compositions to be played *or any control over their selection*." *Shapiro, Bernstein*, 316 F.2d at 307 (emphasis added).

## CONCLUSION

For the reasons explained above, the Court should deny Verizon's motion in full.

---

the decision is an outlier and inconsistent with all of the foregoing and following cases. 2024 WL 945325, at *9 (M.D. Tenn. Mar. 5, 2024).

Dated:  October 17, 2024                    Respectfully submitted,

_/s/  Matthew J. Oppenheim_
Matthew J. Oppenheim
Jeffrey M. Gould
Corey Miller
Keith Howell
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Ave. NW, 5th Floor
Washington, DC 20016
Telephone: (202) 621-9027
matt@oandzlaw.com
jeff@oandzlaw.com
corey@oandzlaw.com
khowell@oandzlaw.com

Alexander Kaplan
Carly K. Rothman
Lauren Bergelson
Bret Matera
OPPENHEIM + ZEBRAK, LLP
461 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
carly@oandzlaw.com
lbergelson@oandzlaw.com
bmatera@oandzlaw.com

_Attorneys for Plaintiffs_